## BYERS v. SOLIER, SUPERINTENDENT OF THE STATE HOSPITAL FOR THE INSANE.

INSANE ASYLUM—POWER OF OFFICERS TO DISCHARGE PATIENTS—
HABEAS CORPUS—ON BEHALF OF ONE CLAIMED TO BE INSANE—
JURISDICTION—EFFECT OF DISCHARGE FROM ASYLUM—RECOMMIT-
MENT—NECESSITY FOR JUDICIAL INQUIRY—CONSTITUTIONAL LAW.

1. With the approval, or under the direction of the state board
of charities and reform, in whom is vested by statute gen-
eral supervision and control of the state hospital for the
insane, the proper officers of that institution have the power
to discharge a recovered patient.

2. A person unlawfully restrained of his liberty as an insane
person is entitled to a writ of habeas corpus upon proper
application.

3. The courts and judges thereof are not divested of their
jurisdiction in habeas corpus by Sections 4894 and 4895,

Revised Statutes 1899, which provide a proceeding in the court of original commitment for a hearing before a jury as to whether one previously declared to be of unsound mind has recovered.

4. In the absence of a statute to the contrary, the controlling authorities of the state hospital for the insane have the power to voluntarily release one committed thereto upon his recovery; and, in the exercise of a reasonable discretion and acting in good faith, whenever the circumstances are deemed to justify it, to release a patient not fully recovered, either unconditionally, or temporarily and upon expressed conditions.

5. Where at the solicitation of his mother, the plaintiff, then a committed patient in the state hospital for the insane, was delivered into her custody by the superintendent of the institution, with the approval of the state board of charities and reform, and taken to her residence in another state, and an entry was made in the hospital records that plaintiff had been discharged as improved. *Held,* that the discharge was unconditional.

6. After the unconditional discharge of a committed patient from the state hospital for the insane, by the proper officers thereof, he cannot be again legally restrained therein, against his consent, without another judicial inquiry to determine his mental condition.

7. A person charged with insanity or other mental infirmity has the same legal right as any other citizen to claim the benefit of constitutional and statutory provisions affecting his personal liberty.

8. The authorities of the state hospital for the insane are not vested with authority to commit a person thereto, nor to confine him there against his consent, without the judicial inquiry provided by law, except one so violently or dangerously insane as to warrant his temporary confinement until the necessary proceedings can be had.

[Decided December 28, 1907.]              (93 Pac., 59.)

Original proceedings on habeas corpus.

The facts are stated in the opinion.

*R. S. Spence,* for plaintiff.

The writ of habeas corpus may be refused to no one who shows a *prima facie* right to discharge. The statutory pro-

ceedings (Secs. 4894, 4895) has but one office—that of restoration to capacity. Restoration to liberty is not mentioned in the sections. Where habeas corpus is an appropriate remedy, it matters not that a remedy also exists by some other proceeding. (Miskimmins v. Shaver, 8 Wyo., 392.) The petition makes out a *prima facie* case. Statutes respecting habeas corpus are entitled to a liberal construction. (*In re* Dowling (Ida.), 47 Pac., 871; Simmons v. Coal Co., 117 Ga., 305.)

The discharge of plaintiff from the asylum terminated the office and effect of the previous commitment, and his present confinement is without legal authority. His mental condition is not such as to require his restraint.

*W. E. Mullen*, Attorney General, for the respondent.

If the committing court acted within its legitimate province and in a lawful manner, its action cannot be questioned by habeas corpus. (Sec. 5498, R. S. 1899; Miskimmins v. Shaver, Sheriff, 8 Wyo., 392; Younger v. Hehn, 13 Wyo., 297.)

The question presented by this application is, whether this court may, in a habeas corpus proceeding, inquire into and determine the present mental condition of an insane patient regularly and legally adjudged insane and committed to the Wyoming hospital for the insane in the first instance. The scope of the remedy by habeas corpus as defined in the adjudicated cases more especially in cases brought for the release of insane or supposed insane persons is influenced in a marked degree by statutory and constitutional provisions existing in the different states. Generally it is perhaps safe to say, that where no special proceeding is provided by statute for the investigation and determination of cases, where persons are restrained on account of mental unsoundness pursuant to court orders, regularly and properly made or otherwise, or in cases where it is alleged that persons who were properly committed to public institutions in the first instance, have subsequently been restored to their right

mind, the remedy of habeas corpus will lie. But the only question in case of a commitment is the jurisdiction of the committing court. (Church Hab. Corp., 382; Kellogg v. Cochran, 87 Cal., 192; In re Breese, 82 Ia., 573; In re Latta, 43 Kan., 543; In re Blewitt, 138 N. Y., 148; 8 N. J. Eq., 533; Cochran v. Amsden, 104 Ind., 282; Gillespie v. Thompson, 7 Ind., 353.)

The necessity for the writ is not apparent. There is no apparent reason, nor any alleged, why the superintendent of the insane asylum should refuse to discharge any patient that has recovered. The records of the institution will show that recovered patients have been released in numerous instances. Again, in any proceeding brought to inquire into the mental condition of a patient confined at the asylum, the testimony and recommendation of the superintendent must of necessity be accorded great weight, by reason of his professional skill, and his facilities for observing any particular case confined for a period at the asylum. It should also be remembered that few persons confined in institutions of that kind will admit that there is any necessity for their confinement. The law recognizes not only the rights of the person confined for treatment, but also the rights of society. (King v. McClain, 26 L. R. A., 795 (63 Fed., 331.) Section 4894 is a part of the general procedure prescribed for the protection, care and detention of insane persons. It affords a method of inquiring into cases where the disability has been removed by recovery. It is the apparent theory of the statute that a judgment of commitment for insanity is not regarded as final, but, on the contrary, is one in which further proceedings may be had at any time, when it is shown by a verified petition that the person so committed has recovered and has been restored to his right mind. (Ayers v. Mussetter, 46 Ill., 472.)

The application in the present case shows that Byers was properly committed in the first instance, but it is alleged that he has since recovered. Here is a question of fact

which under the statute must be inquired into by a jury and there is apparently good reason for it. It does not appear that a guardian has been appointed to represent him; at any rate the petition here filed is not presented by a guardian. How is this court to know whether Byers is a competent party to an action of this character? Our statute provides that the action of an insane person must be brought by his guardian. (Sec. 3472, R. S. 1899.) If he is insane he should appear by guardian; if not insane, he should have his adjudged disability removed in the manner prescribed by Section 4894, as the committing court still retains jurisdiction of the case, and authority to inquire into and determine whether any proceeding by petition for his release is instituted in his interest, before submitting the question to a jury.

POTTER, CHIEF JUSTICE.

In this case a petition for habeas corpus was presented to the chief justice by E. T. Payton for and on behalf of the plaintiff, Ed Byers, alleged to be unlawfully restrained of his liberty at the state hospital for the insane at Evanston, in this state, by Dr. C. H. Solier, the superintendent of that institution. A similar application having been denied by District Judge Craig, within whose district the said hospital is located, for reasons presently to be stated, the petition here presented was referred by the chief justice to the court, and a preliminary hearing was had upon the question of the right to the writ or the propriety of issuing the same, in view of certain provisions of our statute, upon which the decision of Judge Craig, denying the writ, was based. Thereupon our conclusion to issue the writ as prayed for was orally announced, together with the views of the court upon the question argued at the preliminary hearing, and it was then stated that our opinion upon the question would be set out in writing upon finally disposing of the case. The writ was accordingly issued, and made returnable before this court as authorized by the constitu-

tion. (Const., Art. V, Sec. 3.) The defendant, as required by the writ, produced the body of the plaintiff before the court, and the case was heard upon the issues presented by the pleadings.

The petition alleges that the pretended cause of the restraint of said Byers is insanity or idiocy, or both; that about fourteen years ago the said Byers was legally committed to the state hospital for the insane by a competent court of Albany County, in this state, but that the said restraint is illegal for the reason that the said Byers is sane, sensible and able to attend to his own business. The answer and return of the defendant admits that the said plaintiff was duly and properly committed to said asylum or hospital for the insane as an insane patient on or about the month of April, 1893, by the district court of Albany County, pursuant to proceedings therein had to determine plaintiff's mental condition, and alleges in substance that by reason of disease in early childhood the mental development of plaintiff became arrested; that he could not learn to read or write, notwithstanding that he attended school for several years; and that by reason of his defective condition he was in constant trouble, and was finally committed to the said asylum as aforesaid for imbecility. It is further averred in the answer that plaintiff's mental defect is chronic and incurable and that he is what is commonly known as a feeble-minded person; that he is incapable of earning his own living, caring for himself or keeping out of trouble, and that the probabilities are that he will never improve sufficiently to do so. The answer contains the following statement: "At the time of entering the asylum, plaintiff had arrived at the age of eighteen years, and after remaining therein as a patient for eight years, he was, pursuant to an urgent request and representation made by his mother to the effect that she could care for him at her home, delivered into her custody and by her taken to her home in the State of Michigan, on the fifteenth day of June, 1901. In the month of March, 1902, plaintiff was committed to

the Michigan hospital for the insane at Kalamazoo, having become insane while in his mother's custody, and on May 2, 1902, by order of the Michigan authorities, he was returned to the Wyoming hospital for the insane, where he has since remained." The defendant further alleges that as superintendent of the state hospital for the insane he has at all times since the commitment of the plaintiff thereto exercised control and restraint over him, except the period during which he was absent from the said asylum as aforesaid, and that because of plaintiff's mental condition the said control and restraint continues up to the present time. It is further alleged that it has been the policy of the said institution of which the defendant is superintendent at all times to release and discharge patients therefrom, whenever a release and discharge is warranted by a proper degree of recovery, but that it would be contrary to plaintiff's best interests in consequence of his defective mental condition to release and discharge him at this time. It is also alleged that the statutes of this state provide a plain and specific remedy for the determination of cases of this character by a trial before a jury in the court from which the commitment was issued in the first instance, whereby the disability so imposed may be removed in all proper cases.

Upon the filing of the answer and return counsel for plaintiff filed and presented a motion for judgment upon the pleadings and for the discharge of the plaintiff for the reason that upon the averments of the answer it appeared that the plaintiff is held and restrained of his liberty by the defendant without authority or due process of law. Without deciding that motion at the time it was presented it was taken under advisement with the understanding that it should be considered in the final disposition of the case. A reply was thereupon filed which is more in the nature of a demurrer, since it merely denies the sufficiency of the facts set forth in the answer to authorize plaintiff's restraint. Evidence was, however, produced and admitted on behalf of both parties with reference to plaintiff's mental condi-

tion, and his temporary absence from the asylum and the cause thereof, and the matter was taken under advisement upon the pleadings and the evidence for final determination.

1. It is contended on behalf of the defendant that when one having been lawfully committed to the state hospital for the insane claims to have been restored to his right mind, or to have recovered sufficiently to authorize his release, his remedy is not by habeas corpus, but by application for an inquiry into the facts before the court or judge before whom the proceedings were had resulting in the original commitment, pursuant to the provisions of section 4894 and 4895, Revised Statutes of 1899. And it appears that Judge Craig denied the writ upon the petition presented to him on the ground that the proceeding authorized by those sections of the statute afforded a sufficient remedy, and that the restoration to his right mind of a legally committed inmate of the insane asylum was not therefore a matter that should be determined on habeas corpus. The sections referred to read as follows:

Section 4894. "If any person shall allege in writing, verified by oath or affirmation, that any person declared to be of unsound mind has been restored to his right mind, the court or judge by which the proceedings were had shall cause the facts to be inquired into by a jury; provided, that before such matter shall be submitted to a jury it shall be the duty of the court to ascertain and determine whether the proceeding mentioned in this section is instituted and prosecuted in the interest of the person so declared to be of unsound mind; and if found not to be so instituted and prosecuted, the court shall dismiss said proceeding at the cost of the person instituting the same; but if found to be in the interest of the person declared to be of unsound mind, the said matter shall be submitted to a jury, as in this chapter provided. In ascertaining and determining the interest as aforesaid, the court shall have power to examine under oath any and all persons, including the person declared to be of unsound mind."

Section 4895. "The court shall cause notice of the trial to be given to the guardian of the person so declared insane or incompetent, if there be a guardian, and to his or her husband or wife, if there be one, or to his or her father or mother, if living in the county. On the trial, the guardian or relative of the person so declared insane or incompetent, and, in the discretion of the court, any other person, may contest the right to the relief demanded. Witnesses may be required to appear and testify as in civil cases, and may be called and examined by the court on its own motion. If it be found that the person be of sound mind, and capable of taking care of himself and his property, his restoration to capacity shall be adjudged, and the guardianship of such person, if such person be not a minor, shall cease."

As previously stated, the effect of these sections in relation to the right to the writ of habeas corpus was presented and considered at the preliminary hearing, and the question is again raised by the answer and return of the defendant. Notwithstanding the statutory proceeding thus provided for, we concluded, for reasons briefly and orally announced at the time, that the writ might be issued. We will now proceed to formally explain our opinion upon that matter.

It is argued by counsel for plaintiff that the purpose and effect of the sections aforesaid is to provide a remedy only for the restoration to *capacity* of one previously declared to be of unsound mind, and that they do not relate to the release or discharge from the hospital for the insane of a person committed thereto or confined therein. It must be conceded that there is some basis for that argument in the fact that restoration to capacity, and the discharge of the guardian, if any, is the only result expressly provided for. An order releasing the party whose condition of mind is involved from the asylum, if there confined, or from any other existing restraint, is not in terms authorized; nor is there a provision for notice to the superintendent or other official of the asylum, or other person who might have the party in custody. The sections are found in the chapter of

the code of probate procedure entitled, "Guardians of Insane and Incompetent Persons, Lunatics and Drunkards," and in the original act enacted by the first state legislature, the chapter related largely to proceedings and regulations respecting the guardianship of such persons, though it contained certain sections, constituting all that we have on the subject, providing the forum and the method for determining the insanity or incompetency of any person; and the act itself repealed all former statutory provisions covering that matter. In the revision of 1899 some subsequent. enactments with reference to insane or incompetent persons and their commitment to the asylum, or the Wyoming state hospital for the insane as the institution is now named by statute, have been included in the aforesaid chapter of the probate code.

It is well known that the provisions of our probate code were generally taken from the statutes of California, though there are occasional differences between the statutes of the latter state and our code upon the subject. The proceeding under the statute of California similar to the sections above referred to has been held in that state to be only applicable to persons adjudged insane or incompetent, and for whom guardians have been appointed under a related section of its code of civil procedure. (Kellogg v. Cochran (Cal.), 25 Pac., 677; Aldrich v. Superior Court, 52 Pac., 148.) But in that state it seems that there are ample and definite regulations in its political code for the commitment of insane and incompetent persons to the state asylum and their discharge therefrom; and in the case first above cited it was said with reference to the proceeding similar to the one provided for by our statute above quoted, that to hold it to be applicable "to persons committed to the asylums would be utterly inconsistent with the government of those institutions according to the requirements and regulations of the political code." And it was further said:

"After a person has been committed to either of the insane asylums on a charge of insanity, and received into the

asylum, no court in this state is authorized to discharge him therefrom, or to restore him to the capacity of a sane person, under any circumstances, except upon writ of habeas corpus. The power to discharge him otherwise than upon habeas corpus is vested exclusively in the officers of the asylum."

It appears that the political code of California provides expressly that insane persons received into the asylums must, upon recovery, be discharged therefrom, which is held, in the case cited, to imply power to determine whether or not the patient has recovered. And it seems also to be made the duty of the resident physician to discharge persons who may have been improperly committed. There is a further provision of their political code authorizing the kindred or friends of an inmate of an asylum to apply to the judge who committed him for an order to be directed to the trustees of the asylum for his removal to their custody, which may be issued upon their proving that they are capable and suited to take care of him. A still further provision requires the trustees to reject all other orders or applications for the release or removal of any insane person, except an order on proceedings in habeas corpus. (Kellogg v. Cochran, *supra*.)

The construction of the California statute similar to that of this state by the California court is not, therefore, based entirely, if at all, upon the language thereof, or its relative position in the general statutes or the original act containing it, but quite largely, if not altogether, upon the effect of the provisions of a separate code relating particularly to persons committed to an asylum. The sections of our statute under consideration were unquestionably suggested by the similar California statutes, and, in the main, the language of the latter is followed by our statute, yet there is some slight difference in that respect, and the statute here has been amended since its original adoption in a particular immaterial to the question now being discussed. The provisions of the political code of California referred to in

the decisions above cited have not, however, been adopted in this state, and we have no statutory provisions similar thereto or to the same effect. It is apparent, therefore, that the California decisions construing their statute corresponding to our own cannot be regarded as controlling or even persuasive authority upon the effect or application of our statute and the proceeding thereby provided for.

We do not find any express provision of our statutes authorizing the discharge of a patient committed to the insane asylum, and, except by habeas corpus, there seems to be no remedy to enforce such discharge unless afforded by the statute in question. We entertain no doubt, however, of the power as well as the duty of the proper officers of the asylum to discharge a recovered patient, at least with the approval or under the direction of the state board of charities and reform,, in whom is vested general supervision and control of that and all other charitable institutions supported by the state. (Rev. Stat. 1899, Secs. 633, 634.) It is self-evident that the object of establishing the hospital for the insane was not the involuntary confinement of persons of sound and healthy minds, and that such hospital is not a proper place for the restraint of a person subject to no mental infirmity. And, indeed, the board and superintendent, as appears by the answer herein, and the evidence in this case, have exercised the power of discharge from time to time, by releasing such patients as were deemed to have reached a proper degree of recovery to warrant it. Nevertheless, the fact remains that there is no statute particularly regulating that matter which could affect the construction to be given the sections authorizing the proceeding, which is here suggested as a statutory remedy sufficient to justify, if not to require, the denial of the writ of habeas corpus in cases of this character.

In the California case of Kellogg v. Cochran, *supra,* an official discharge from the asylum pursuant to the statute was held to operate as a restoration to capacity of the person so discharged; and thus the proceeding provided by their

civil code would be unnecessary to obtain a restoration to capacity of one committed to an asylum, but without guardian. Whether restoration to capacity of one without a guardian would follow a discharge by an official of the asylum in this state, in the absence of express statutory authority for such discharge, is not necessarily involved in this case, for here we have merely the question of the legality of the plaintiff's restraint to consider and determine. But it would seem that as our statute providing the proceeding referred to contains no exceptions, and is unaffected and unqualified by other statutory provisions, one who had been committed to the asylum, though without a guardian, might invoke it to have his restoration to capacity judicially declared. Indeed, Section 4895 seems to imply that the party whose restoration to capacity is sought may be without a guardian.

Whether the proceeding may be instituted for the further purpose of procuring by judicial order a release from the insane hospital or from any other restraint is a more serious question, and we think may be subject to some doubt. We are of the opinion, however, that it is unnecessary to decide that question in this case. Our comments in relation to the matter have been for the purpose of suggesting to those interested the unsatisfactory, if not doubtful, condition of our statutes regarding the remedy for the discharge upon recovery of one committed to the hospital for the insane, since it is a subject that can be and clearly ought to be regulated by legislative enactment, within reasonable and constitutional restrictions.

If it should be conceded that the legality of the confinement of a party in the asylum, whose sanity or soundness of mind is alleged, may be determined in the aforesaid statutory proceeding, and his release enforced thereby, we are of the opinion, nevertheless, that the courts and the judges thereof are not divested by the statute of their jurisdiction conferred by the constitution to issue writs of habeas corpus on petition by or on behalf of any person in actual custody.

(Const., Art. V, Secs. 3, 10.)   Moreover, we observe nothing in the statute in question to indicate a legislative attempt to interfere with that jurisdiction.   If the statute had clearly authorized an order for a party's release from custody by the proceeding provided for, it might, perhaps, have afforded a sufficient reason for requiring a resort to it before the issuance of a writ of habeas corpus; though in such event we are satisfied that the power would exist to issue the writ and determine the legality of the restraint without compelling a resort in the first instance to the statutory proceeding.   But as there is some doubt as to the effect of the statute, and we have no doubt of the jurisdiction in habeas corpus, we were and are of the opinion that the writ ought to be issued upon the petition filed herein and the legality of the restraint of plaintiff determined thereon.   That a person unlawfully restrained of his liberty as an insane person is entitled to a writ of habeas corpus upon proper application, as well as a person illegally confined upon any other ground or excuse, is not, we think, open to question. (16 Am. & Eng. Ency. L. (2d Ed.), 598.)   In a Michigan case this principle was forcefully stated as follows:   "The writ of habeas corpus penetrates the walls of insane asylums as fully and freely as any other place where persons are illegally restrained of their liberty."   (Palmer v. Circuit Judge, 83 Mich., 528.)

2.   In our statement of the case the averment of the answer is quoted which relates to the release of the plaintiff from the asylum at his mother's request in June, 1901, and his again becoming an inmate thereof in May, 1902.   It appears from the evidence respecting that circumstance that at the solicitation of the mother, the defendant, as superintendent of the asylum, with the approval of the board of charities and reform, caused the plaintiff to be delivered into her custody, and he was taken to Michigan, where the mother then resided, and an entry was made in the records of the institution to the effect that he had been discharged as improved.   Within a short time after his commitment to

the Michigan institution for the insane, the authorities of that state, having learned of his previous confinement in the asylum here, contended that he was a proper charge of this state, and insisted that he be received and taken care of by this state; whereupon, by the consent or order of the board of charities and reform, he was brought back and again placed in the hospital for the insane at Evanston, where he has since been restrained, without further commitment or further proceedings in this state to determine his mental condition.

The motion for the discharge of plaintiff upon the pleadings was based upon the allegation of the answer showing such release, and plaintiff's subsequent confinement without a new judicial inquiry; and the point suggested by the motion is also raised upon the evidence. So that, irrespective of the question whether the condition of plaintiff's mind is such as to constitute him a proper subject for restraint in a hospital for the insane, the sufficiency of the proceedings to authorize his present restraint is presented upon the above facts.

The statute is somewhat indefinite respecting the commitment and discharge of insane persons or those affected with mental unsoundness, who are not accused or convicted of any offense against the criminal laws, and that is particularly noticeable as to the form and terms of the commitment, or the order therefor, and the authority to discharge one from custody who may have been committed to the hospital for the insane, as well as the condition or occasion which will authorize or require such a discharge. It is provided that the determination of the insanity or incompetency of any person shall be by a jury of six men before the district court, or, in vacation, before the judge, or the court commissioner or clerk of court. (Rev. Stat. 1899, Sec. 4879-4883.) And the clerk is required to furnish the person to whom he issues the warrant a certified copy of the verdict and the physician's lunacy statement (which statement is required by Section 4884), and the person to

whom the warrant is issued is required to deliver such certified copies with the commitment warrant to the superintendent of the hospital at the time of commitment. (Id., Sec. 4886.)

Whenever a person is adjudged insane and ordered by the proper court to be committed to the hospital for the insane, the clerk of court is required to notify the superintendent of the hospital of such proceedings; and thereupon the superintendent is required, under such rules as shall have been provided by the state board, to conduct or cause to be conducted the person so declared to be insane to the hospital for the insane. (Id., Secs. 650-652.)

A section of the Revised Statutes of 1887 (Sec. 3765) is not brought into the revision of 1899, but is probably in force, as to its continuing provisions which have not been abrogated or repealed, by virtue of Section 2714, Revised Statutes of 1899, which provides that "all acts or statutes in relation to public institutions of the state" in force at the time of the act providing for the last named revision shall continue in force, or expire, according to their respective provisions or limitations, and shall not be construed as repealed by anything in the said revision contained, or the act providing therefor. Said section of the Revised Statutes of 1887 is found in the chapter devoted to the insane asylum—now the hospital for the insane—and provided for notice to the commissioners of the various counties of the completion and readiness for use of the asylum building whenever that should occur; whereupon it was further provided that after the receipt of such notice, each board of county commissioners should cause all persons adjudged to be insane, and whose care shall have been thrown upon the county, to be sent as patients of the territory (state) to the insane asylum at Evanston, to be kept and cared for by the territory (state).

That a discharge from the asylum or hospital upon discovery of the mental soundness of a patient or the recovery of one committed to it was contemplated by the legislature

is evident from the provisions of Section 4888, Revised
Statutes of 1899, which was enacted in 1897, imposing the
duty upon the state to pay all expenses of returning re-
covered patients, and patients found not to be insane, to
their respective homes or the county from which they were
committed. But there seems to be no provision of the stat-
utes expressly authorizing or requiring a discharge by the
asylum authorities.

Manifestly an original judicial inquiry under the statute
into a person's mental condition has reference to the condi-
tion of the person at the time of the hearing, and a verdict
of insanity or incompetency will be based upon such condi-
tion at that time. In other words, if it be so found, the per-
son is then declared to be of unsound mind, and as such the
commitment to custody follows. But the hearing, verdict,
order and commitment will not necessarily adjudicate the
condition of the party for all time. It is evident that in
many cases recovery may occur. It would seem, therefore,
that the commitment should require the restraint of the
party only during the period that the insanity, unsoundness
of mind, or incompetency shall continue, or until he shall
be lawfully released.

In the absence of a statute making positive regulations
for a voluntary discharge, must a patient once committed
to the asylum be retained there until released upon habeas
corpus, or by some other authorized judicial proceeding by
which a release may be enforced; or, without a judicial
investigation, may the officers in charge of the institution
discharge one committed to it when they are able to deter-
mine that a proper degree of recovery has occurred to jus-
tify it, or upon the happening of any condition rendering the
discharge in their judgment advisable? We are of the
opinion that, in the absence of a statute making contrary
regulations or restrictions or expressly or impliedly vesting
exclusive authority in the premises elsewhere, the controlling
authorities of the institution, to carry out the obvious pur-
pose of its establishment, must be held to possess the power

to voluntarily release a committed party upon his recovery; or, in the exercise of a reasonable discretion and acting in good faith, whenever the circumstances are deemed proper to justify such a course, to release a patient who may not have fully recovered, either unconditionally or temporarily and upon expressed conditions. That the state board and the superintendent have found the exercise of such power to be necessary, in the present state of our statutes, is shown by the averments of the answer in this case. If that should be deemed too great a power to vest in the hospital authorities without restriction, it is a matter easily remedied by legislation. It is clearly not impossible or even improbable that in occasional cases the character of the mental disorder of an inmate may be such that his care out of the institution by relatives or friends willing to assume the burden thereof will be proper without endangering the welfare of the patient or the safety of the public.

In Rutter v. State, 38 O. St., 496, it appeared that a patient had been committed to the state hospital for the insane, and the superintendent of the institution, believing the same for the patient's welfare, permitted her temporary removal out of the state in the charge and custody of her sister. Such action was upheld, notwithstanding that there was no statute expressly authorizing it; and the court refused a mandamus at the suit of the patient's husband to compel her restoration to the asylum. The court said that "the power of the superintendent is measured, in no small degree, in matters of that sort, by the apparent welfare of the patient." The statutes of Ohio provided that a patient might be discharged on the application of the superintendent to one of the trustees, and order of such trustee, and that there might be a discharge at the request of friends of the patient upon giving a bond if required by the superintendent conditional upon the safe keeping of the patient. The removal of the patient in the case cited was not made pursuant to either of those provisions, but in the exercise of a general discretion for the best interest of the patient. (See also Stratham v. Blackford, 89 Va., 771.)

Having concluded that the authorities in control of the hospital for the insane may in good faith discharge a patient committed thereto, we are next to inquire into the effect of an unconditional discharge, such as occurred in 1901 by the discharge of the plaintiff in this case. We refer to that discharge as unconditional, for we think the circumstances show it to have been such. That any condition was attached to the discharge is not disclosed by the answer or the evidence. It may have been and probably was confidently expected that the patient would be kept out of the state, or at least safely in the mother's custody, but it does not appear that the release of plaintiff was conditioned upon that being done.

In view of the matter heard and determined upon a lunacy inquisition under the statute providing therefor, and the effect of an order and commitment for the restraint of the party found upon such an inquisition to be of unsound mind or incompetent, the conclusion seems to be inevitable that the hearing and commitment will have served their purpose and ceased to be effectual after an unconditional discharge from the place of lawful restraint by competent authority. If circumstances thereafter should arise seeming to require or justify a renewal of the custody and restraint, in the interest of the person or the public, another hearing ought to be had to determine the question. Great injustice would often, if not generally, result from a different rule, even if the legal rights of the party to be personally affected were not to be considered. But a person charged with insanity or other mental infirmity has the same legal right as any other citizen to claim the benefit of constitutional and statutory provisions affecting his personal liberty.

In the case of *In re* Thorpe, 64 Vt., 398, the following facts were presented: The relator, an inmate of an asylum for the insane, was ordered discharged by two of the three supervisors of the insane upon condition that, in case it should become necessary to return him to the asylum, it might be done by a revocation of their order by one of them.

The relator was thereupon discharged from the asylum, and a few months afterward one of the two supervisors who had signed the discharge order revoked it, and an officer thereupon took the relator into custody for the purpose of returning him to the asylum. The laws of the state conferred upon the supervisors of the insane authority to discharge such incurable persons as may, in their judgment, be safely and properly cared for in the place from whence they were committed, but provided that persons so discharged should require for their recommitment to the asylum only the revocation of their discharge by the supervisors. Upon the facts and the law thus stated, it was held, in a habeas corpus proceeding brought by the relator, that the supervisors could impose only such conditions in discharging him as were authorized by the statute; that the power to revoke a discharge was not conferred upon one of their number, but upon a majority of them; that the question passed upon in discharging the relator concerned his personal liberty, and that, when a majority of the supervisors had once adjudged that he be discharged, he could not again be deprived of his liberty except in the manner pointed out in the statute. For those reasons the relator was held to be unlawfully deprived of his liberty and it was ordered that he be discharged from the custody of the officer.

In Gresh's case, 12 Pa. County Court Rep., 295, a petition in habeas corpus was presented by a brother of a party confined in the hospital for the insane, and, after a hearing, an order was made releasing him temporarily until a date therein stated, at which time he was required to again appear, and his wife and the hospital authorities were also required to then appear to show cause why there should not be a full discharge. The petition set up as a ground for release of the party in whose interest it was filed that he had been fully restored to his reason, and was not held for any criminal or supposed criminal matter. At the next hearing the evidence was somewhat conflicting as to the mental condition of the party whose liberty was sought, but

the court felt satisfied of his soundness of mind and discharged him.   The following remark of the court is pertinent to the inquiry here: "If the reason, or judgment, of the relator should again fail him to such an extent as to make it a dire necessity to interpose and control him,   *   *   *   the law governing the same may be resorted to and enforced, as in other cases."

Although, in the present state of our statutes and as they existed in 1901, the asylum authorities may discharge an inmate, if that be deemed proper in their judgment, they are not vested with authority to commit a person thereto, nor to confine him there against his consent without the inquiry provided by law, except, perhaps, temporarily, in the case of one violently or dangerously insane, until the necessary proceedings can be had, to avoid the injury which might be reasonably expected to occur if the party was allowed to be at large.   Generally, it is permissible, without warrant or express authority, to confine temporarily a person disposed to do mischief to himself or another person, until the proper proceedings can be instituted to have the question of his sanity determined.   In such a case the restraint becomes necessary and, therefore, proper both for the safety of the party himself and for the preservation of the public peace. (16 Am. & Eng. Ency. L. (2d Ed.), 596.)

The case before us does not come within the exception above noted.   The restraint complained of appears not to have been undertaken in contemplation of the statutory proceeding for a commitment, but upon the order of the board in the exercise of a supposed duty without further proceedings.   The act of the board and superintendent was no doubt in good faith in renewing their custody of the plaintiff; and it may be assumed that if he was a public charge, which seems probable, the burden thereof properly rested upon this state.   There is nothing in the evidence before us to show that his relatives or any friend, at the time, was interposing in his behalf, or offering to undertake the responsibility of his support, and we understand that he had

no means or estate of his own. We are of the opinion, however, that to justify his continued restraint without his consent a judicial inquiry pursuant to statute was and is required.

According to the evidence the plaintiff is not vicious; and he is not insane in the sense that he is subject to delusions. His mental development appears to have been arrested during childhood, and his condition is best expressed, as stated by the superintendent, by the term "feeble-minded." That official testified that the plaintiff is unable to take care of himself, owing to such arrested development, resulting in his lack of knowledge and inability to acquire knowledge about matters essential to his own interests if allowed to remain at large; and in the superintendent's opinion his mind is incapable of substantial improvement, though the party presenting the petition here seems to hold a contrary view.

The plaintiff was not only present, but was examined as a witness in his own behalf. So far as he possessed information he answered intelligently; but he appeared to be deficient in a knowledge of numbers and money values, and seemed to have but little comprehension thereof. He admitted that in regard to the exchange of money he would require assistance. He expressed a desire and intention, if released, to take up a homestead and cultivate it near the residence of his friend who presented his petition; and he gave evidence of some understanding respecting the elementary requirements in the cultivation of the soil. He had, it appears, before his commitment to the asylum in 1893, worked at times for others in the city of Laramie, where he then lived; and at the asylum he has been intrusted with certain daily duties, but not calling for the exercise of much, if any, independent judgment. He has had a part in cultivating a garden upon the asylum premises and raising produce for the market upon his own account, in company, however, with another, who we understand took charge of the business features of the enterprise. Plaintiff's restraint

is, therefore, not a temporary necessity so as to be authorized without a warrant or commitment.

Inasmuch as our decision is based upon the insufficiency of the proceedings to authorize the retention of the plaintiff in the hospital for the insane, and that upon such ground he has a right to demand his release, we do not think it necessary or proper to consider the question whether his condition is such as would render his commitment justifiable upon proceedings instituted pursuant to law.

The friend of the plaintiff, who has interceded in this case in the latter's behalf, has announced his willingness and desire to take charge of the plaintiff in case of his release, so far as the same may be necessary for his protection, and we assume that he will do so. There is no apparent reason, therefore, even if it would be authorized in any case to make any other order in the premises than for plaintiff's discharge. For the reasons above stated we find that the plaintiff is unlawfully deprived of his liberty, and an order will be entered discharging him from custody.

BEARD, J., and SCOTT, J., concur.