Wanda G. GILLIS, Appellant,

v.

Dale C. CAMERON, Superintendent, St. Elizabeths Hospital, Appellee.

No. 17803.

United States Court of Appeals District of Columbia Circuit.

Argued July 1, 1963.

Decided Oct. 3, 1963.

Mr. Edward E. O'Neill, Arlington, Va. (appointed by the District Court), for appellant.

Mr. Max Frescoln, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., and Frank Q. Nebeker and Oscar Altshuler, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and BASTIAN and McGOWAN, Circuit Judges.

BAZELON, Chief Judge.

On October 7, 1958, appellant was found of unsound mind and committed to St. Elizabeths Hospital, a public mental hospital in the District of Columbia (Mental Health Case No. 1473–58). On November 23, 1958, she left the Hospital without permission and returned to her home in New York. On December 8, 1958, while she was still in New York, the Hospital recorded that appellant was discharged as "improved." Four years later, in December 1962, she returned to the District of Columbia and called at the office of the Vice President of the United States. As a result of her behavior at that time civil commitment proceedings were again instituted against her (Mental Health Case No. 2454–62). Before their completion, but after appellant had demanded a jury trial under D.C.Code § 21–312 (1961), the Commission on Mental Health moved to dismiss the proceedings on the ground that the previous civil commitment order of 1958 was still in effect and a legal basis for her present detention. The District Court granted the motion and

appellant filed the instant habeas corpus petition alleging that her present detention is unlawful because the 1958 order is no longer in effect. After a hearing, the District Court dismissed the petition and this appeal followed.

■ The District Court's holding that appellant's present detention in St. Elizabeths Hospital is legal was based on two points. First, the court held that her discharge as "improved" in 1958 did not terminate the earlier commitment order. Second, the court held that appellant could be recommitted without further hearing because an adjudication of unsoundness of mind, entered at the same time as the 1958 commitment order, was still in effect. We shall discuss these points in order.

At the hearing below, Dr. Harris, Acting Superintendent of St. Elizabeths, testified that there are four categories under which patients are discharged from the Hospital: "recovered," "social recovery," "improved" and "unimproved." In addition, the Hospital releases patients on parole.[1]

Discharge of patients under the classification "improved" is a generally accepted practice. The hospital attaches no conditions to the release of patients so discharged. Therefore a discharge as "improved" must be regarded as legally final. Lindman & McIntyre, eds., The Mentally Disabled and the Law 227 (1961) (The Report of the American Bar Foundation on the Rights of the Mentally Ill). Consequently, as other jurisdictions have decided, a new commitment proceeding must be held to compel a patient's return to the hospital. Hatton v. State Board

of Control, 146 Tex. 160, 166, 204 S.W.2d 390, 393 (1947); Byers v. Solier, 16 Wyo. 232, 250, 93 P. 59, 64, 14 L.R.A.,N.S., 468 (1907);[2] Lindman & McIntyre, ibid.

Adoption of a contrary rule for this jurisdiction would, to employ language from Lynch v. Overholser, 369 U.S. 705, 714, 82 S.Ct. 1063, 1069, 8 L.Ed.2d 211 (1962), be "quite out of keeping with the congressional policy that underlies the elaborate procedural precautions included in the civil commitment provisions [which seem intended] to insure that only those who need treatment and may be dangerous are confined."

A discharge as "improved" purports, on its face, to rest upon an expert medical judgment that the patient's condition has sufficiently improved so as not to require further hospitalization for the safety of the patient or the community. In the present case, however, the testimony was ambiguous as to whether, in fact, appellant's discharge was based upon such judgment or was merely a bookkeeping entry recorded for administrative convenience. The Acting Superintendent of the Hospital testified that at the time appellant left the Hospital without permission to return to New York, and at the time she was discharged a few weeks later, the Hospital staff was of the opinion that she was still in need of hospital care. There was also testimony to support the District Court's finding that "because petitioner was a non-resident of the District of Columbia, because she could not be compelled to return to this jurisdiction, and as a matter of administrative policy in the keeping of its records, the hospital on

---

1. The Acting Superintendent of the Hospital testified that, unlike other released patients, paroled patients are not dropped from the rolls and discharged. They continue their treatment as out-patients and make periodic visits to the Hospital. The record is silent as to whether paroled patients are returned to the Hospital without further proceedings. But the general rule is that no further proceedings are necessary since the patient

is released only conditionally—the condition presumably being that he demonstrate ability to function adequately outside the hospital. See Lindman & McIntyre, eds., The Mentally Disabled and the Law 227 (1961).

2. In Byers, as in the present case, the former patient had been "discharged as improved." 16 Wyo. at 245, 93 P. at 63.

December 8, 1958 noted petitioner discharged as improved." [3] But other testimony of the Acting Superintendent was to the effect that if the staff had thought her dangerous, the New York police would have been notified and further hospitalization proceedings would have been instituted. This was not considered necessary.[4] At the very least, the testimony fails to show that appellant's discharge is not what it purports to be, namely, an unconditional discharge. Therefore she may not be recommitted under the 1958 commitment order, and her detention is legal only if the 1958 adjudication of unsoundness of mind affords an adequate basis.

■ We turn, therefore, to the District Court's ruling that, since appellant had then been declared to be "of unsound mind" and since she has not been legally restored, "this patient needs no further adjudication as being of unsound mind and is properly in Saint Elizabeths Hospital under the 1958 adjudication. * * *" We agree that the adjudication of unsoundness of mind is still in effect.[5] But in our opinion it does not follow that her present detention is authorized. To hold otherwise would overlook the proper distinction between the standards which should be applicable to determining unsoundness of mind, on the one hand, and the need for commitment to a hospital on the other.[6]

Although our law provides that only persons of unsound mind may be committed, it does not require the commitment of all persons of unsound mind. See D.C.Code § 21–316(C) (2). Nor does it provide that one who has been committed must be detained until he is legally declared of sound mind. To hold that it does, "would be to ignore the rule that although a person may be of unsound mind to the extent that he cannot con-

---

3. The District Court also pointed out that the Hospital authorities advised the Secret Service that she had left the Hospital. But the notification to the Secret Service was part of an administrative policy requiring that notice be given whenever the Hospital discharges a patient who had attempted to see the President, as appellant had done prior to the 1958 commitment. Such notification is not based on the staff's opinion as to the patient's condition.

4. The Acting Superintendent also testified: "We felt she had been ill for a period of at least 10 years before this. She had gotten along out of the hospital with her illness. We felt that she had improved to some degree, but was still ill, was still showing some impairment of judgment. We felt she would still benefit from hospitalization * * *. But we decided it was to her best interests if she had the responsibility of trying to continue her life as at least free of the possibility of being picked up and being returned to the hospital."

5. Although appellant was eligible to do so, she did not petition for restoration under D.C.Code § 21–320 which provides that one who has been committed to St. Elizabeths and has been released for six months or longer either as improved or on parole, may petition the District Court for "restoration to the status of a person of sound mind."

Dr. Harris testified that St. Elizabeths Hospital institutes proceedings for patients whom it discharges as recovered. Statutory authority for this procedure is contained in ch. 738, § 2, 33 Stat. 740 (1905), 24 U.S.C. § 210 (1934) (apparently through oversight, this section does not appear in later editions of the United States Code or in the current District of Columbia Code).

6. The confusion is compounded in this jurisdiction because only those who are adjudicated of unsound mind may be committed. See D.C.Code §§ 21–315, 21–316(C) (1) (1961).

The Mental Health Commission's recommendation for commitment must be predicated on a finding that the person is "of unsound mind." § 21–316(C) (1). The court may then order commitment if it, or a jury, finds the person to be "insane." § 21–315. The latter term is thus apparently used synonymously with the phrase "of unsound mind." Indeed, the standard form of order entered by the court in such cases, as in the instant case, adjudicates the person "of unsound mind." See In the Matter of Gillis, Mental Health No. 1473–58 (1958).

tract, nevertheless he cannot lawfully be restrained unless his mental condition is such as to render it necessary that he be placed under restraint. [It] * * * would be to hold that when a mentally ill patient has once been confined in a state hospital for treatment he cannot be discharged until he has been completely restored to reason." Hatton v. State Board of Control, 146 Tex. at 163–164, 204 S.W.2d at 391. Since the law recognizes that not all persons adjudged of unsound mind need be hospitalized, it follows that once a patient has been discharged from the hospital, even though he remain under an adjudication of unsoundness of mind, he cannot on that account be recommitted without a de novo proceeding. Therefore the District Court erred in holding that appellant's failure to obtain restoration to legal competency rendered her subject to recommitment under the 1958 order.

We reverse the District Court and hold that appellant's present detention under the 1958 commitment order is illegal. If it now appears that appellant requires further hospitalization, additional commitment proceedings must be instituted.

This case suggests a problem which deserves comment. The legislative trend throughout the country is away from making commitment depend on an adjudication of incompetency.[7] Those concerned to protect the rights of the mentally disordered are looking with increasing disfavor on judicial decrees which take away a collection of individual rights, without specific findings as to the need to do so in each individual instance.[8] The law in the District of Columbia would seem to be particularly vulnerable to criticism on these grounds. Dr. Harris testified that "commitment to a hospital here automatically renders a patient legally incompetent. We feel that there are many patients in the hospital who are legally competent * * *." Yet in order for these patients to get the hospitalization they require, they are, under our statutory procedure adjudged "of unsound mind." The disadvantages of commitment being dependent on such an ad-

7. See Lindman & McIntyre, supra at 221 and sources cited. See also S. 935, 88th Cong., 1st Sess. (1963) ("A bill to protect the constitutional rights of certain individuals who are mentally ill, to provide for their care, treatment, and hospitalization, and for other purposes." This bill would change the law in the District of Columbia.)

8. See Report of the Task Force on Law, President's Panel on Mental Retardation pp. 20–21 (1963):
   "The retardate must have unhampered access to all lawful activities, except those for which he is disqualified by lawful restrictions.
   "Such restrictions may be of several kinds. The first includes activities for which some general 'capacity,' 'competency,' 'soundness of mind,' or similar standard is the legal touchstone, such as the right to enter into enforceable contracts or to make a valid will. A second category relates to special restrictions which have no direct reference to 'general competence' and which most adults, but only some who are retarded, can satisfy. Some retarded people can

drive a car safely, for example, others of equal 'general competence' cannot. A third category concerns activities for which the law requires a named competence beyond the customary knowledge and achievements of the general population, e. g., licensing requirements for a wide variety of businesses and professions, particularly where the licensing requires formal examination, or the demonstration of special experience or skill.
   "The retardate may thus be excluded from a number of activities, or precluded from the exercise of what would be his rights if he were not retarded. This can happen without any formal challenge, or identification of retardation. But it does not render the procedure contrary to his interest, or to the public interest, provided the statutory or administrative requirements are reasonably related to the performance of the regulated activity. It is, however, important to avoid indiscriminate disqualification from a particular activity because of a finding of 'incompetence' under a statute regulating other activities of a different type."

judication of general incompetency are compounded by the failure of the statute to specify the implications of the adjudication. The result is a rebuttable presumption of incompetency to engage in any activity for which the law requires one to be "of sound mind." [9] Thus, without any inquiry or finding as to *actual* competence in the given area, a patient in St. Elizabeths Hospital, or a former patient who has not been legally restored to soundness of mind, may apparently be deprived of the right to vote,[10] to drive an automobile,[11] to enter into binding legal arrangements [12] and to exercise other civil rights.[13]

Reversed.

BASTIAN, Circuit Judge (dissenting).

While Congress has established judicial proceedings for restoration of status after a person has been civilly committed to a mental institution, this court now holds that, by the simple act of escaping, the patient can avoid adjudication of her status in the courts. Thus a dangerously insane patient may be committed to Saint Elizabeths Hospital on Monday, walk out on Friday (as it appears may easily be done), be held to be "improved" under the circumstances present here, and, by the escape, the legal proceedings before the Commission on Mental Health are *nullified*. As I understand the statutory scheme this holding completely undercuts the intent of Congress and I must, therefore, dissent.

The commitment order which placed appellant in the hospital is still in effect. Had she not fled the hospital it is clear that § 21–320 D.C.Code would compel her to apply to the District Court to effect her release by habeas corpus.[1] The majority holding means that every time a patient escapes and becomes legally a fugitive the commitment becomes void and a new jury determination must be made of the patient's mental condition.

The bizarre conduct of appellant at the Vice President's office is pregnant with dangerous possibilities and confirms the views of the Saint Elizabeths Hospital staff that at the time of her escape she

---

9. Cf. In re Williams, 157 F.Supp. 871, 875, aff'd, Overholser v. Williams, 102 U.S.App.D.C. 248, 252 F.2d 629 (1958).

   We do not mean to imply that our statutes limiting the rights of the mentally disordered use uniform terminology. Indeed, one of the difficulties in ascertaining precisely what rights are affected by a general adjudication is the variety of ill-defined legal phrases. E. g., the commitment statutes use the terms "of unsound mind" and "insane," see note 6 supra; the phrase "insane person" is defined to include "every idiot, non compos, lunatic, and insane person," D.C.Code § 49–207 (1961); the statute governing appointment of a committee refers to persons "non compos mentis," D.C.Code § 21–301 (1961); the electoral law, to the "mentally incompetent," D.C.Code § 1–1102(2) (1961); the statute governing the issuance of drivers' licenses, to the "mentally qualified," D.C.Code § 40–301 (1961). The Mentally Disabled and the Law rightly points out in this context that "one of the major sources of confusion in the law has been the use of vague and nebulous descriptive terms." Id. at 4.

10. D.C.Code § 1–1102(2) (1961).

11. D.C.Code § 40–301 (1961).

12. See Life Ins. Co. of Va. v. Herrmann, 35 A.2d 828 (Mun.Ct.App.D.C.1944) (adjudication of unsoundness of mind created rebuttable presumption of incapacity to change beneficiary of life insurance policy). And see the testimony of Dr. Harris: "We also had the problem of patients who were discharged from the hospital as improved, legally unrestored, who wished to return to the hospital on a voluntary basis, and could not get in because they were not legally competent to sign the contract with the District of Columbia."

13. See Mental Competency Study, The George Washington University, Objective Data for the District of Columbia pp. 15–17 (preliminary mimeographed draft, July 17, 1963). See generally, Lindman & McIntyre, supra at 220.

1. Overholser v. Boddie, 87 U.S.App.D.C. 186, 184 F.2d 240, 21 A.L.R.2d 999 (1950).

was still in need of treatment and should not be allowed at large.

The provisions of § 21–320 make it plain that every patient released on parole by the hospital must petition for restoration in order to set aside the original commitment order.

I now proceed to a consideration of the uncontroverted facts as they appear from the record.

In 1958, in Mental Health No. 1473–58, appellant was for the second time admitted to Saint Elizabeths Hospital after an adjudication of civil commitment. Subsequent to her commitment, and on November 23, 1958, she left the hospital without permission ("eloped" apparently being the term used for this conduct). She had been adjudicated as a nonresident of the District of Columbia and procedure had been instituted under § 21–317, D.C.Code, for her transfer to New York prior to her elopement. According to the hospital authorities, she returned to New York after her escape; thus she was out of this jurisdiction and was not returnable to Saint Elizabeths, in view of her nonresidency status. She wrote to the hospital asking for her personal belongings and the hospital attempted to hold her property for a while, to see if she would return to continue treatment. On further indication that she was badly in need of her property and that she planned to stay in New York, and as her return could not be forced since she was a nonresident of the District of Columbia, there was noted on her record at the hospital that she was discharged as "improved."

Nothing further appears to have happened until December 17, 1962, when appellant was apprehended in the District of Columbia and was detained at the District of Columbia General Hospital for the following reason:

"[S]he appeared at the Office of the Vice President of the United States on the afternoon of December 17, 1962, demanding that she see the Vice President, because she needed money. She stated that Washington was being run by an 'electronic machine' and that she was to take President Kennedy's job. She further stated that she was going to let Vice President Johnson be the President for a short period of time. Subject was highly nervous and upset and it was felt for her own safety and welfare, she should be committed for observation."

A petition [Mental Health No. 2454–62] for commitment to a hospital for treatment was filed and Mr. Edward E. O'Neill was appointed her guardian ad litem. After a hearing held December 31, 1962, the Commission on Mental Health filed its report and recommendations, finding that appellant "is of unsound mind suffering from Schizophrenic Reaction, Paranoid Type, is incapable of managing her own affairs and should be committed to a hospital for treatment of her mental condition." Among those testifying at the hearing was a special agent of the Secret Service, who testified to the circumstances prior to appellant's admittance to the hospital and that this mental behavior indicated the need for observation in a hospital for the patient's own safety and welfare. The Commission recommended that she be adjudged to be of unsound mind and that she be admitted to Saint Elizabeths Hospital "for maintenance and treatment of her mental condition until she may be safely discharged or returned to the state of her residence." Mr. O'Neill concurred in the recommendation of the Commission. Thereafter, on oral motion, an order was entered dismissing that proceeding and appellant was readmitted to the care and custody of appellee under the commitment order entered in Mental Health No. 1473–58.

Thereupon, the present action [Habeas Corpus No. 43–63 in the District Court] was filed through Mr. O'Neill, seeking appellant's discharge from the hospital. The return of the Superintendent of the hospital set forth the facts of the prior commitment, denied appellant's illegal

commitment and contended that the commitment under Mental Health No. 1473–58 was still in full force and effect. The Superintendent's answer further included the following:

"2. During this petitioner's period of confinement in Saint Elizabeths Hospital, she has been under the care and observation of members of the medical staff of Saint Elizabeths Hospital, skilled in the care, diagnosis and treatment of nervous and mental disorders, who are of the opinion that she is suffering from Schizophrenic Reaction, Paranoid Type; that she is of unsound mind, to wit: the petitioner talked with much pressure about delusional and grandiose material, she felt that other people had deprived her of bringing up her son, had prevented her from going to college and had interfered with her jobs. She noted that she had come to Washington to see the Vice President about 'the Interstate fund for orange, that's me.' Then indicating that she meant she wished to change her name to orange and she wished to open public lounges and community centers where people could stay. She also related that people were employing an electronic machine, that her profession was that of an electrologist, for the removal of superfluous hair. *It is considered that her judgment is extremely poor and insight nil; and that she is still in need of care and treatment in a mental hospital.*" (Emphasis supplied)

This latest case then came on for hearing before Judge Jones of the District Court. At that hearing, a psychiatrist representing Saint Elizabeths Hospital[2] testified that "discharged as improved" meant that they considered appellant somewhat better than when she was first admitted to the hospital, but that she was not legally restorable and had not reached the point where it was felt that she could go back into society. He further testi-fied that at the time of her escape she had not in any way completed her treatment and was still in need of care and treatment. As a matter of fact, upon her leaving the hospital without permission, the hospital authorities wrote to her family and told them she needed to be returned to the hospital. Appellant had been under the surveillance of the Secret Service also and they were notified of her address in New York. The record is clear that had she returned to the hospital at that time she would have been kept there, at least for some time.

The uncontradicted evidence before the District Judge shows that there are four basic conditions for discharge from the hospital. The first is "recovery," which means that if the patient becomes ill again and requires hospitalization it would be a new illness and the patient would be certified to the United States District Court for restoration of civil rights. Then there is what is known as "social recovery," which means that a nucleus of the illness remains but that the patient's recovery has been sufficient to enable him to conduct his responsibilities in life and not be dangerous. This patient also is certified to the United States District Court for restoration. The other two categories are "improved" and "unimproved" and are explained in the testimony of the psychiatrist as follows:

" 'Unimproved' means that as far as we can see the patient has shown no change since he came into the hospital. And often, if such a person leaves the hospital unimproved, if it is an escape, for instance, we might notify the police, in view of the fact that we assume that this person is dangerous, having been committed to the hospital.

"The 'improved' category refers to those patients who may leave the hospital without permission, or in the case of a patient who we think can benefit no longer from hospitalization but is not sufficiently well to be able to take care of his own re-

---

2. This psychiatrist was also the Acting Superintendent of the hospital.

sponsibilities outside the hospital, in such a case as an elderly person who requires the continued assistance of a committee. The 'improved' patient who is discharged is not certified for legal restoration."

It also appears that when a patient escapes and nothing is heard from him, the hospital, after a period of time (usually a shorter period for a nonresident of the District) usually discharges the patient from the hospital in order to keep their records up to date and in order not to have a large collection of unclosed records.

No evidence indicating that appellant is now of sound mind was offered.

At the conclusion of the hearing, Judge Jones filed an opinion,[3] findings of fact and conclusions of law, and entered an order dismissing the petition for writ of habeas corpus. The findings, all supported by uncontradicted evidence, are as follows:

"1. Petitioner, Wanda G. Gillis, a non-resident of the District of Columbia, was committed to Saint Elizabeths Hospital on October 7, 1958 after having been adjudicated of unsound mind in Mental Health Case No. 1473–58.

"2. On November 23, 1958 petitioner left Saint Elizabeths Hospital without permission and returned to her home in New York.

"3. The hospital felt that petitioner needed further hospitalization and attempted unsuccessfully to induce her to return to Saint Elizabeths Hospital.

"4. Because petitioner was a non-resident of the District of Columbia, because she could not be compelled to return to this jurisdiction, and as a matter of administrative policy in the keeping of its records, the hospital on December 8, 1958 noted petitioner discharged as improved.

"5. Wanda G. Gillis returned to the District of Columbia in December 1962 when, because of her actions, civil commitment proceedings were again instituted. (Mental Health Case No. 2454–62) The Court dismissed this case on the motion of the Commission on Mental Health that the previous civil commitment order in 1958 was still in effect.

"6. Guardian ad litem for Wanda G. Gillis thereupon filed the present petition for a writ of habeas corpus alleging only that petitioner is presently illegally detained on the ground that the commitment order of October 7, 1958 in Mental Health Case No. 1473–58 is no longer in effect."

This appeal followed.

There has been no legal adjudication for restoration to sanity. § 21–320, D.C. Code (1961) provides:

"Any insane person who has been committed to Saint Elizabeths Hospital or any other hospital, and who shall have been released from such hospital as improved, or who shall have been paroled from such hospital (but who shall not have been discharged as cured), and who shall have been absent from the hospital on release or parole for a period of six months or longer, shall have the right to appear before the United States District Court for the District of Columbia for a hearing to determine the sanity and right to restoration to the status of a person of sound mind of said insane person by filing a petition therefor with the court upon a form to be provided by the commission for that purpose. It shall be the duty of the commission to make an examination of the records of Saint Elizabeths Hospital of the insane person as may be necessary to determine such questions, and if necessary have the person examined by the members of the staff of Saint Elizabeths Hospital and to make a report and recommendation to the court. In the event the commission shall find from the records

3. As Judge Jones' opinion is unreported, I attach it as an appendix.

and examination that the said person is of sound mind and shall recommend to the court the restoration of said person to the status of a person of sound mind such recommendation shall be sufficient to authorize the court to enter an order declaring such person to be restored to his or her former legal status as a person of sound mind. In the event the commission shall find such person to be of unsound mind, it shall report that finding to the court. Upon the filing by the commission of a report finding such person to be of unsound mind, the insane person shall have the right to a hearing by the court or by the court and a jury. For the purpose of making the examination and observations required by this section, the commission shall have the right to examine the records and to interrogate the physicians and attendants at Saint Elizabeths Hospital or any other hospital in which such patient shall have been confined, who have had the insane person under their care, and the commission may recommend to the court the temporary recommitment of such person for said purpose. At such trial by the court or by the court and jury, an adjudication shall be made as to whether the person is of sound mind or is still of unsound mind."

Appellant has never been restored to capacity through this procedure, and the mere entry on the record that she was discharged as "improved" certainly cannot operate as an adjudication that she is of sound mind. The entry is purely administrative.

The above quoted section of the D.C. Code provides for a jury trial when a patient, paroled or released as improved, petitions for restoration and the Commission on Mental Health finds the patient of unsound mind. Appellant did not apply for such a trial, and it would seem fairly clear that had she done so, and had she been granted one, she would not have been discharged, in view of her mental condition.

The District Judge makes clear in his opinion that appellant, through her escape from Saint Elizabeths Hospital, is seeking to obtain a benefit unavailable to a patient who does not escape. As the 1958 commitment remains in full force and effect, it was incumbent upon appellant to convince the court, in view of her being held under that commitment, that she has recovered her sanity and is entitled to her release. This she has signally failed to do. Cf. Overholser v. Boddie, supra note 1.

In sum, I think appellant, for her own safety and for the safety of public officials and others, and in accordance with law, should remain in Saint Elizabeths Hospital until she has been properly determined to be of sound mind.

For these reasons I dissent.

### APPENDIX

#### Opinion of
#### District Judge William B. Jones

I am going to discharge the rule and dismiss the petition, and in doing so I want to state why.

This patient, Mrs. Wanda G. Gillis, first in 1957 and again in 1958, was adjudicated by this Court as being one of unsound mind, and on each occasion was committed to Saint Elizabeths Hospital. On both occasions she left the hospital without permission and without having been cured of her mental illness. In 1958 she left in November and, on the records of the Saint Elizabeths Hospital, she was discharged as improved in December 1958.

In my view, as long as she remains under a decree of adjudication and an order of commitment of this Court, she is under a legal disability, to say the least. And in this instance, since she needed, at the time she left, further hospitalization, there is every reason to think that the order of commitment should have continued at least until such time as the Hospital permitted her to leave, either on parole or discharged as improved.

That was not so in this case. The Hospital, according to Dr. Harris, the Acting Superintendent, felt that she needed con-

tinued hospitalization. The only reason they did not bring her back, as I understood the Doctor, was that she was a nonresident. She was out of the jurisdiction and they had no way of bringing her back. But they did advise the Secret Service, who are responsible for the safety and welfare of the President of the United States and the Vice President of the United States. She in 1958 had attempted to see President Eisenhower.

Under Section 21–320 of the District of Columbia Code, 1961 edition, provision is made for one who has been discharged as improved or, as the Code uses the words, "released from such hospital as improved," or one who has been paroled from the hospital, but in neither case has been discharged as cured. That patient may, while a parolee or one discharged, or again, as the Code uses the term, "released," petition for restoration. Unless that petition is granted, that particular patient remains under the decree of adjudication as being of unsound mind.

There is no provision in the Code, so far as I can find, about an escapee or one who leaves without permission. However, it seems to me that one who escapes from the hospital, one who leaves without permission, should not be in a better position than one who has been permitted to leave, by parole or released as improved; that since either he who has been released as improved or he who has been paroled, and who shall have been absent from the hospital on permissive release or parole for a period of six months or longer, has to file a petition for restoration to the status of a person of sound mind, then this patient, Wanda Gillis, who was not so released or so paroled, but left without permission, would have to obtain legal restoration. Until that restoration, it is my opinion that this patient needs no further adjudication as being of unsound mind and is properly in Saint Elizabeths Hospital under the 1958 adjudication, if not the 1957. This is not to say she cannot petition for a writ of habeas corpus on the ground that she is no longer insane. But the writ should not issue on the point here asserted.