2002 WY 17

In the matter of the ESTATE AND GUARDIANSHIP OF Paul K. ANDREWS, Incompetent:

Ethel Sheets and Blanche Wood, Appellants (Defendants),

v.

U.S. Department of Veterans Affairs; First National Bank of Buffalo, N.A.; and Jack R. Andrews, Appellees (Plaintiffs).

No. 00–267.

Supreme Court of Wyoming.

Feb. 5, 2002.

F.M. Andrews, Jr., Riverton, WY, Representing Appellants Ethel Sheets and Blanche Wood.

Aleksander D. Radich for U.S. Dep't of Veterans Affairs; William D. Omohundro, Buffalo, WY, for First Nat'l Bank of Buffalo; and Fred R. Dollison, Sheridan, WY, for Jack R. Andrews, Representing Appellees U.S. Dep't of Veterans Affairs; First Nat'l Bank of Buffalo, N.A., and Jack R. Andrews.

Scott Powers, Sheridan, WY, Guardian ad Litem for Paul K. Andrews.

Before LEHMAN, C.J., and GOLDEN, HILL, and KITE, JJ.

LEHMAN, Chief Justice.

[¶ 1] This is an appeal from an order setting aside a deed executed by Paul K. Andrews (Andrews) to appellants Ethel Sheets and Blanche Wood. The district court set aside the deed as void after determining Andrews had been adjudicated an incompetent person in 1989, and thus did not have the power to execute the deed. Appellants assert that Andrews has never been "adjudicated" as incompetent and that the appointment of a conservator for Andrews under the Uniform Veterans' Guardianship Act (UVGA), Wyo. Stat. Ann. §§ 3–6–101 through 3–6–119, is of limited effect and cannot be used as a mechanism to set aside their warranty deed. We agree and reverse the district court's order setting aside the deed and remand for proceedings consistent with this opinion.

## ISSUES

[¶ 2] Appellants present these issues for review:

I. The lower court was without *in personum* jurisdiction over the person and property of the ward for want of personal service.

II. If the Court had jurisdiction over any property of Andrews, it was limited to the monies received by him from the Bureau of Veterans Affairs as disability compensation and the earnings, interest and profits therefrom.

III. The Court erred as a matter of law in finding that Andrews did not have the power to convey his property on November [25], 1998 and declaring the warranty deed from Paul K. Andrews to Ethel Sheets and Blanche Wood void, and setting it aside.

IV. The Court's findings and conclusions were erroneous as a matter of fact and law.

Appellees Department of Veterans Affairs and conservators assert these issues:

I. Appellants have no standing to challenge the lower court's exercise of *in personum* jurisdiction over the original guardianship proceeding.

II. Laches, waiver and *res judicata* preclude a collateral attack of the 1989 court proceedings.

III. The trial court's findings and conclusions contained in the order appealed from are not clearly erroneous.

## FACTS AND PROCEDURAL HISTORY

[¶ 3]  Andrews is a veteran who is entitled to benefits.  In January of 1989, the Veterans' Administration (hereinafter "the VA") in an ex parte administrative proceeding rated Andrews, then aged sixty-two, as incompetent.  *See* 38 C.F.R. § 3.353.  Subsequently, though Andrews continued to live in his Story, Wyoming home unassisted, on April 13, 1989, a Petition for Appointment of Conservator and Guardian was filed in the probate court of Sheridan County by Key Bank of Wyoming and Jack R. Andrews (Andrews' brother).  This petition was captioned "In the Matter of the V.A. Guardianship and Conservatorship of Paul K. Andrews, an incompetent."  It alleged *inter alia:*

9.  That Paul K. Andrews is a veteran and receives a retirement in the sum of Seven Hundred and Eighty Dollars ($780.00) per month and a disability payment in the sum of One Thousand Four Hundred and Eleven Dollars ($1,411.00) per month.

10.  That the appointment of a Guardian or Conservator of his estate is necessary, as Paul K. Andrews is unable to manage his financial affairs and as a condition precedent to the continuing payment of monies due him by the Veterans Administration.

11.  That notice of these proceedings has been served upon the Veterans Administration Medical Center at Sheridan, Wyoming.

[¶ 4]  In their prayer for relief, the petitioners requested

that Key Bank of Wyoming, Trust Division, and Jack R. Andrews be appointed Co–Conservators of the estate of Paul K. Andrews, an incompetent, that Jack R. Andrews be appointed Guardian of the person of Paul K. Andrews, and that letters of guardianship be issued to the Co–Guardians of the estate and to the Guardian of the person of Paul K. Andrews upon the taking of the oath prescribed by law and bond as set by the Court.

Jack R. Andrews, the Vice President/Trust Officer of Key Bank, and the attorney for the petitioners signed the petition.

[¶ 5]  Attached to the petition were two certificates.  The first, dated October 20, 1988, was signed by a physician employed by the Veterans' Hospital certifying that he had examined Andrews on that date and stating his opinion that Andrews was incompetent to manage his financial affairs unassisted.  It further declared, "this Certificate is made and given pursuant to Wyoming Statutes, Sections 3–6–101 through 3–6–119."  The District Counsel for the Veterans' Administration in the State of Wyoming executed the second certificate, dated February 6, 1989.  It certified that the VA had rated Andrews incompetent and that "appointment of a guardian is a condition precedent to the continuing payment of monies due Paul K. Andrews by the Veterans Administration."[1]  It further stated that, "this Certificate is made and given pursuant to Section 3–6–107, Wyoming Statutes 1977."

[¶ 6]  On the date the petition was filed, the district court issued an Order Appointing Conservator and Guardian which named Key Bank of Wyoming and Jack R. Andrews as co-conservators to the estate of Andrews and Jack R. Andrews as guardian.  Pursuant to the court's order, an initial inventory and receipt of estate assets was executed by Key Bank, approved by VA district counsel, and filed with the district court on August 1, 1989.  In December of 1989, the co-conservators petitioned the court to order Andrews an allowance of $1,200 per month, to order the purchase of a new satellite dish, to order reasonable funds disbursed to pay for Andrews' traveling expenses to visit his family in Idaho and California, and to order the donation of Andrews' 1971 Jeep to Sheridan County Search and Rescue.  On January 11, 1991, Andrews executed a Last Will and

---

1.  This statement is required under Wyo. Stat. Ann. § 3–6–107 (LexisNexis 2001) for the appointment of a guardian under the UVGA. However, clearly under federal rule it is no longer necessary for such appointment to take place through the UVGA.  *See fn.5.*  We find no authority that ever *required* any such appointment take place through a state adjudication of incompetency as a condition precedent to the payment of VA benefits to veterans rated as incompetent by the VA.

Testament revoking his previous wills and codicils.

[¶ 7] In August of 1992, the co-conservators petitioned the court for: 1) a hearing on the annual accounting of Andrews' estate; 2) an order authorizing payment for a $1,255.81 feed and equipment bill Andrews had incurred; and 3) an order changing the "co-guardianship" from Key Bank Trust Company to an appropriate financial institution in Buffalo, Wyoming. Upon the hearing, with no objection from the co-conservators or the VA, First National Bank of Buffalo, Wyoming was substituted as co-conservator for Key Bank of Wyoming. During the course of 1993, with leave of the court and no objection by the co-conservators or the VA, Andrews sold his real property and home in Story and purchased a smaller home in Sheridan, Wyoming.

[¶ 8] Sometime in the fall of 1994, Appellant Ethel Sheets, Andrews' cousin, moved from Powell, Wyoming to Sheridan. Her mother, appellant Blanche Wood, is Andrews' aunt and a long-time resident of Sheridan. Ms. Sheets began to live with Andrews in his home and undertook cooking for Andrews as well as general home care. Later that year, apparently concerned about this arrangement and Ms. Sheets' access to Andrews' allowance income, the co-conservators unsuccessfully attempted to evict her from Andrews' home.

[¶ 9] On September 11, 1995, Andrews petitioned the court to terminate his guardianship. He alleged, *inter alia*, that he had been examined by a local physician and, based upon this examination and a psychological evaluation taken by a local psychologist, he was mentally competent to handle his own financial affairs and to care for himself and that a guardianship and a co-conservatorship were no longer necessary and "an unwarranted expense and an unnecessary drain upon [his] assets." The VA, through counsel, responded to this petition. Andrews did not further pursue the termination.

[¶ 10] Andrews and Ms. Sheets continued to reside in his home together until October 16, 1998. On that date, Ms. Sheets returned from an out of town trip and found Andrews lying on the floor in his bedroom. She contacted the VA Hospital, and Andrews was admitted to the hospital by ambulance. The doctor who admitted Andrews reported that Ms. Sheets sent for the ambulance because Andrews was found in an unhygienic condition and because she was concerned he did not have the awareness to help resolve the situation or care for himself. This doctor diagnosed Andrews as suffering from "dementia" among other physical ailments.

[¶ 11] In November of 1998, Andrews was transferred to the VA's Nursing Home Care Unit. Repeated neuropsychological testing by the VA since that time has led it to continue to evaluate Andrews as incompetent. It was further determined that his physical and mental condition prohibited him from returning to his home. On November 6, 1998, Andrews executed and signed a document in front of two witnesses which read:

TO WHOM IT MAY CONCERN:

This will give my cousin, Ethel Sheets, permission to live in my house at [address], Sheridan, Wy., and to take care of the house and yard for me as she has done in the past. The duration to be while I am in the Veterans Hospital and nursing home. The expenses for running the home are to be paid for as in the past by the conservatorhip [sic].

Thereafter, Ms. Sheets continued to reside in Andrews' home, and it was her presence that is the presumed impetus behind the litigation that followed.

[¶ 12] On January 14, 1999, the co-conservators petitioned the court to sell Andrews' home, stating that his medical providers did not feel he could ever return to live there and that they "desire and need the sole custody of the premises and the property of [Andrews'] estate in order to serve the best interests of [Andrews]." In response to this petition, the same attorney who had represented Andrews in his request to terminate his guardianship in 1995, came forward with a warranty deed dated and filed with public record on November 25, 1998. This deed prepared by the attorney, signed by Andrews, and notarized by a Sheridan notary, conveyed Andrews' home to Ethel Sheets and Blanche Wood as joint tenants with a

right of survivorship reserving a life estate to Andrews. This attorney filed many petitions and counter-petitions on behalf of Andrews and Ethel Sheets. On May 27, 1999, in response to the co-conservators' motion to disqualify this attorney from representing Andrews on the grounds of conflict of interest, the district court disqualified the attorney from representing Andrews. He also ordered all of the pleadings and petitions filed by the attorney on behalf of Andrews stricken from the record. On November 19, 1999, in response to the co-conservator's motion to disqualify the attorney, the district court, citing conflict of interest in his representation of Andrews, further ordered that this attorney be disqualified from representing either Ethel Sheets or Blanche Wood and that all responsive pleadings or petitions he had filed on their behalf be stricken from the record. The issue of the correctness of these rulings is not before us, and we take no position on them herein. It is solely the validity of this deed that is the subject of the instant appeal.

[¶ 13] On April 9, 1999, in a cross-claim, the co-conservators moved to set aside the warranty deed as void. Thereafter, on April 27, 2000, the case culminated in a hearing on the conservators' Amended Petition for Guidance from the Court Regarding Status and Disposition of Real and Personal Property of the Ward. In this petition the co-conservators alleged *inter alia* that the co-conservator bank was currently paying all of the expenses associated with Andrews' residence and that the co-conservator has requested Ethel Sheets and Blanche Wood pay a reasonable rental for their occupation of the residence.[2] They further petitioned the court to set aside the deed as invalid because it was executed by one adjudicated incompetent; or, should the court find the deed valid, that the court grant permission for them to terminate payment from Andrews' estate for any expenses associated with the house. Sheets and Wood responded arguing *inter alia* that the proceeding in 1989 was not an adjudication of incompetency and alleged that the 1989 order should be set aside as a

violation of Andrews' due process rights. They also asserted that at the time the deed was executed Andrews was competent to make such disposition as he desired.

[¶ 14] On June 12, 2000, the district court entered its order finding in part that: 1) the 1989 proceedings were valid and according to law in all respects and were an adjudication of incompetency because the original court found Andrews to be suffering from a mental illness or deficiency; 2) that Andrews continues to be a mentally incompetent person; 3) because Andrews has been consistently represented by counsel over the years and none of his counsel have ever raised any issues regarding any irregularity in the initial appointment of the guardian any attack on it now is barred by res judicata, laches, and waiver; 4) that pursuant to Wyo. Stat. Ann. § 3–6–110(b) the conservators in this matter are authorized to manage all of Andrews' assets; and 5) pursuant to Wyo. Stat. Ann. § 3–1–202, Andrews did not have power to convey real property; accordingly, the deed executed by Andrews was void in all respects and of no force or effect. This timely appeal followed.

### STANDARD OF REVIEW

[¶ 15] In deciding this case, the district court made express findings of fact and conclusions of law. We have stated that we do not afford the factual findings of a judge the limited review given a jury verdict. *Mathis v. Wendling*, 962 P.2d 160, 163 (Wyo. 1998); *Springer v. Blue Cross & Blue Shield of Wyoming*, 944 P.2d 1173, 1176 (Wyo.1997) (citing *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 538 (Wyo.1993)). While this court presumes that the district court's findings of fact are correct, we may examine all of the properly admissible evidence in the record. *Springer*, 944 P.2d at 1176. Our review does not include reweighing disputed evidence, and we give the judge's opportunity to assess the witnesses' credibility due regard. *Id.* We will not set aside the district court's findings of fact unless the findings are inconsistent with the evidence, clearly erro-

---

**2.** Blanche Wood denied that she resided in Andrews' home. Both Sheets and Wood denied

that they had been requested to pay rent.

neous, or contrary to the great weight of the evidence. *Frost Const. Co. v. Lobo, Inc.,* 951 P.2d 390, 394 (Wyo.1998) (citing *Narans v. Paulsen,* 803 P.2d 358, 360 (Wyo.1990)). Additionally, we review a district court's conclusions of law de novo. *Springer,* 944 P.2d at 1176.

## DISCUSSION

[¶ 16]   We believe the issues before us can most effectively be resolved if addressed in the following manner: 1) standing of the appellants to assert deficiencies in the 1989 proceedings; 2) determination of the character of the 1989 proceedings; 3) the scope and effect of the 1989 appointment of the guardian and conservators on the estate of Andrews, including the power of Andrews to convey real property.

### Standing/Collateral Attack

[¶ 17]   Appellees urge that this court recognize that appellants lack standing to collaterally attack the 1989 proceedings, arguing that they stand in no different posture with respect to this guardianship than do complete strangers off the street. They further assert: "Their relatively recent beneficiary status under a deed executed in violation of state statute cannot confer standing to retroactively attack the propriety of proceedings leading to the establishment of the guardianship in 1989." In regard to standing, this court has said:

> At its most elementary level, the standing doctrine holds that a decision-making body should refrain from considering issues in which the litigants have little or no interest in vigorously advocating. Accordingly, the doctrine of standing focuses upon whether a litigant is properly situated to assert an issue for judicial or quasi-judicial determination. A litigant is said to have standing when he has a "personal stake in the outcome of the controversy." This personal stake requirement has been described in Wyoming as a "tangible interest" at stake. The tangible interest requirement guarantees that a litigant is sufficiently interested in a case to present a justiciable controversy.

*Schulthess v. Carollo,* 832 P.2d 552, 556–57 (Wyo.1992) (citations omitted).

[¶ 18]   In the instant case, appellants' property interest in having their warranty deed declared valid by the court as a proper conveyance and quieting title to the residence in them is a "tangible interest" sufficient to give them a "personal stake in the outcome of the controversy." We further note, in fact, it was appellees who summoned the appellants into this litigation when they petitioned the district court to void the appellants' deed. Appellees cannot now assert that appellants have no standing to defend their deed and urge that it be recognized as valid.

[¶ 19]   The question, then, remains whether appellants may assert that the 1989 proceedings are void and thus subject to collateral attack. This court has defined a collateral attack as

> an attack on a judgment in any manner other than by action or proceeding whose very purpose is to impeach or overturn the judgment, or, stated affirmatively, a collateral attack upon a judgment is an attack made by or in an action or proceeding that has an independent purpose other than impeaching or overturning the judgment....

*Hume v. Ricketts,* 69 Wyo. 222, 240 P.2d 881, 883 (1952) (quoting L.R.A. 1918D 470, 472). We discussed the doctrine as follows:

> Jurisdiction of the court over the parties is an essential to the validity of any judgment and a personal judgment rendered without such jurisdiction is void. However, the judgment is presumed to be valid and the presumption in favor of jurisdiction extends to jurisdiction of the parties. By the general rule, a collateral attack may not be made upon a judgment where the absence of jurisdiction over the parties does not appear upon the record. It seems to be the general rule that a void judgment, such as one wherein the court lacks jurisdiction over the parties, can be attacked collaterally only where the invalidity appears on the face of the record. Where the invalidity does not appear on the face of the record, the proper action is a direct attack.

*Id.* (citations omitted); *see also Osborn v. Painter,* 909 P.2d 960, 963 (Wyo.1996).

[¶ 20] In *Travis v. Estate of Travis,* 79 Wyo. 329, 334 P.2d 508 (1959), a probate court vacated and set aside as void a district court's earlier decree of divorce. On appeal, the Travis appellants asserted that the decree had been attacked collaterally in violation of law. The Travis appellees, relying on Wyoming cases, asserted that a judgment affirmatively appearing on the face of the record to be void may be attacked collaterally or otherwise. In deciding the issue, this court then necessarily undertook to decide whether or not the record, on its face, showed the divorce decree to be void. Ultimately, the court determined that the record did not make that showing sufficiently to overcome the presumption of jurisdiction recited in the district court's order. *Id.*

[¶ 21] As to who may assert that a judgment is void and thus subject to collateral attack, we think that 47 Am.Jur.2d *Judgments* § 916 (1995) aptly states the general rule which this court has followed in the course of its jurisprudence: "A void judgment or final order is subject to collateral attack at the instance of any person affected by it, at any time and in any proceeding in another court of equal jurisdiction." In the instant case, appellants indisputably have been "affected by" the 1989 judgment appointing the guardian and establishing the conservatorship because it was enforced against them to render their 1998 deed invalid. Therefore, we find they are proper parties to assert that the 1989 proceedings were void *ab initio.* Nonetheless, ultimately whether this or any judgment is subject to collateral attack must begin with a determination of whether or not the record on its face shows the judgment to be void.

### Character of the 1989 Proceedings

[¶ 22] The district court in its order of June 12, 2000, determined that "[t]he file contains sufficient evidence that the ward, Mr. Paul Andrews, was an incompetent person as defined in Wyoming Statute 3-1-101(a)(xii) on April 13, 1989. The 1989 Order was an adjudication of incompetency because it specifically found Mr. Andrews to be suf-

fering from a mental illness or deficiency." This conclusion drawn by the district court on the character of the 1989 proceedings is significant. As discussed *infra* whether a guardian or conservator is appointed under the general guardianship statutes found in Wyo. Stat. Ann. §§ 3-1-101 through 3-2-202, or under the veterans guardianship statutes found in Wyo. Stat. Ann. §§ 3-6-101 through 3-6-119, will determine the scope and effect of the appointment. We find this conclusion by the district court to be clearly erroneous.

[¶ 23] The 1989 proceeding was an appointment of a guardian under the Uniform Veterans' Guardianship Act (UVGA), Wyo. Stat. Ann. §§ 3-6-101 through 3-6-119. The petition itself, as well as the certificates attached to it executed by the VA physician and VA general counsel, each indicate that the guardianship was sought under the UVGA. The petition complies with § 3-6-105 precisely, going so far as to list all of the proposed Ward's nearest relatives and their residences as required by subsection (b). Moreover, the petition purports to have provided notice to the VA. That fact, coupled with the VA's continued inclusion in this case as a party in interest as mandated by § 3-6-103(b), clearly shows that the action was brought under the UVGA.

[¶ 24] Further, the various co-conservators have explicitly acknowledged over the years that the appointment was brought under the UVGA. The first year's accounting of the estate executed by Key Bank spanning the time period of April 13, 1989 to April 30, 1990 states

[t]hat, to the best of affiant's understanding and belief, Wyoming Statutes Section 3-6-112, which governs fees allowable to guardians under the Uniform Veterans' Guardianship Act and is applicable to this estate, permits compensation to a guardian for ordinary services up to an amount of five percent (5%) of the income of the ward for the said accounting period; and that, for the said accounting period, the amount so calculated would be $2,778.92.

The court and VA approved this accounting and have generally continued to do so over the course of the guardianship.

[¶ 25] It appears from its order that the district court made its determination that the 1989 proceeding was an adjudication of incompetency based solely on the fact that the original court had referenced Wyo. Stat. Ann. § 3–1–101(a)(xii) in the order establishing the guardianship. However, were we to conclude that the 1989 proceedings were an attempt to adjudicate the incompetency of Andrews, this court would be compelled herein to declare the order issued void.

[¶ 26] It was stated in *Thoeming v. District Court of Sixth Jud. Dist.*, 379 P.2d 543, 544 (Wyo.1963) in which this court issued a writ of prohibition against a district court:

> It is elementary that proceedings for adjudication of insanity or mental incompetency are required to be in strict compliance with statutory requirements. In the absence of such compliance a judgment declaring a person to be of unsound mind is void. One court in this area has well expressed the rule in saying, "If there is any class of cases which should be conducted with the utmost care to observe all of the requirements of the statute, it is the cases conducted for the purpose of determining the sanity of a citizen...."
>
> ...
>
> ... The procedure for determining that a person is insane or mentally incompetent is definite and clear. It requires a finding either by a lunacy commission or by a jury and that only after various steps have been taken. Any attempt to adjudicate a person as an 'incompetent' without compliance with the statutes contained in this chapter would be a deprivation of due process. Since there had been no adjudication of Thoeming's incompetence on July 13, 1962, the district court was without jurisdiction to appoint a guardian for him and such purported order is void.

*Id.* (citations omitted); *see also Interest of AM*, 694 P.2d 734 (Wyo.1985).

[¶ 27] The Wyoming statutes found in title three governing adjudications of incompetency contain detailed and extensive procedural safeguards as well as substantive guidelines to ensure that the appointment of a guardian and/or conservator takes place in a manner consistent with constitutional due process. Wyo. Stat. Ann. § 3–2–102 enacted in 1985 explicitly lists the parties who must be provided notice of the involuntary appointment of a guardian.[3] Wyo. Stat. Ann. § 3–2–103 continues to codify the State's statutory and constitutional precedent by providing that "[t]he petitioner, *the proposed ward* or his custodian may demand a jury trial" on the question of incompetency. *See Byers v. Solier*, 16 Wyo. 232, 93 P. 59, 63 (1907) (discussing 1899 revised probate code governing "Guardians of Insane and Incompetent Persons, Lunatics and Drunkards" and issuing a writ of habeas corpus in favor of a party in state mental institution).

[¶ 28] Based upon our review of the record in this case, we hold that the 1989 appointment of a guardian and conservator for Andrews took place pursuant to the provisions of the UVGA. Moreover, this court will not place its imprimatur of approval on the 1989 proceedings as an adjudication of Andrews' incompetency sufficient to satisfy the due process guaranteed to him by the United States and Wyoming Constitutions.

### Scope & Effect of Appointment of Guardian under UVGA

[¶ 29] Having herein determined that the appointment of the guardian and conservator for the estate of Andrews took place pursuant to the UVGA, we must now address whether this appointment deprives Andrews

---

3. Appellees argue that it could plausibly be concluded that Andrews' acquiescence in the 1989 establishment of the guardianship/conservatorship indicate that the proceeding was voluntary and, thus, did not require notice be given to Andrews. While we agree that it appears from the record that Andrews acquiesced in the original appointment, the version of Wyo. Stat. § 3–2–105 in place in 1989 provides the method by which a voluntary guardianship may be established and leaves no doubt that a voluntary

guardianship is not available under the facts of the instant case:

> A guardian may be appointed by the court *upon the petition of the proposed ward* if the petitioner *is not a mentally incompetent person* or a minor under the age of fourteen (14) years, if the court determines that the appointment is in the best interest of the petitioner.

Wyo. Stat. Ann. § 3–2–105 (Michie 1997) (enacted 1985) (emphasis added).

of his ability to validly convey the property of his estate. For the following reasons, we hold that it does not.

[¶ 30] In 1929, Wyoming adopted the UVGA found in Wyo. Stat. Ann. §§ 3–6–102 through 3–6–119. 1929 Wyo. Sess. Laws ch. 6 § 18. Wyo. Stat. Ann. §§ 3–6–118 and 3–6–119 expressly state the manner in which the UVGA shall be construed, interpreted, and applied:

> This act [§§ 3–6–101 through 3–6–119] shall be construed liberally to secure the beneficial intents and purposes thereof, and shall apply only to beneficiaries of the bureau.

and

> This act [§§ 3–6–101 through 3–6–119] shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

This court has had previous occasion to interpret and construe the scope and effect of the UVGA in *Matter of Estate of Roosa*, 753 P.2d 1028 (Wyo.1988). In that case we held:

> The Uniform Veterans' Guardianship Act does not specify any grounds for appointment of a guardian. Such a guardianship is of limited effect and relates primarily to the receipt of veterans' benefits. The conclusion of the Veterans' Administration as to incompetency does not depend upon a finding of insanity which would justify an adjudication in state courts. Annotation, Constitutionality, Construction, and Effect of the Uniform Veterans Guardianship Act, 173 A.L.R. 1061 [ (1948) ]. The ordinary procedural safeguards involved in the creation of guardianship are not required under the Uniform Veterans' Guardianship Act. Furthermore, the appointment of a guardian or conservator in this state does not constitute any adjudication of unsoundness of mind or lack of testamentary capacity. Section 3–1–201, W.S.1977 (1985 Replacement). We hold that the creation of a guardianship pursuant to the Uniform Veterans' Guardianship Act does not result in any presumption of insanity or lack of testamentary capacity, a conclusion that is supported by authority elsewhere. *Morse v. Caldwell,* 55 Ga.App. 804, 191 S.E. 479

(1937); Annotation, 173 A.L.R. 1061, *supra,* and cases cited therein.

*Id.* at 1036–37.

[¶ 31] We find no reason to now depart from our holding in *Estate of Roosa* as to the limited effect of the appointment of a guardian under the UVGA. On the specific point of whether the appointment of a guardian under the UVGA strips a veteran ward of his ability to validly convey property, we again turn for reference to Annotation, *Constitutionality, construction, and effect of the Uniform Veterans' Guardianship Act,* 173 A.L.R. 1061 (1948) and cases decided by other jurisdictions.

> The effect of the appointment of a guardian under the uniform act is very limited as compared with the effect of an appointment under the general laws. In view of the nature of the grounds upon which a guardian may be appointed, the appointment is not an adjudication that the ward is mentally incompetent. In fact, one of the purposes of the uniform act is to secure a simplified procedure for the appointment of a guardian without the expense and notoriety of an inquiry as to the veteran's sanity.
>
> Accordingly, the appointment of a guardian under the uniform act has been held not to affect the legal capacity of the ward with respect to various matters other than the administration of property received from the United States under veterans' legislation. Thus, *the ward may conduct litigation in person, he may make valid contracts notwithstanding the appointment of a guardian under the uniform act* ...

173 A.L.R. § 12 (emphasis added and footnotes omitted). In explanation of the reference to the simplified procedure of the uniform act, the annotation clarifies:

> To some extent the procedure is simplified by the provisions ... concerning prima facie evidence of the necessity for the appointment of a guardian. [Wyo. Stat. Ann. § 3–6–107]. To a larger extent the procedure is simplified because it does not involve an inquiry into the sanity of the beneficiary, which often requires a trial by jury, testimony by psychiatrists, and a pro-

tracted trial, although the beneficiary may convert the proceeding into a complicated one if he wishes to contest the appointment. Another factor simplifying the actual appointment is the fact that even a mentally incompetent beneficiary can ordinarily be made to understand that the Veterans' Administration will not make payments without the appointment of a guardian, and so he is not apt to contest the appointment of a guardian for the limited purposes specified in the act.

*Annotation,* 173 A.L.R. § 12 n. 7 (citations omitted). *See also* 77 Am.Jur.2d *Veterans and Veterans' Laws* § 50 (1997).

[¶ 32] We find this reasoning persuasive. In the instant case, we also take specific note that in order to set aside the appellants' warranty deed as invalid, it was necessary for the district court to reference Wyo. Stat. Ann. § 3–1–202. This provision is located within the General Guardianship statutes and provides:

> (a) A ward who is a minor or a mentally incompetent person for whom a conservator has been appointed does not have the power to convey, encumber or dispose of property in any manner, except:
>
> > (i) By will if he possesses the requisite testamentary capacity; or
> >
> > (ii) As provided by W.S. 2–1–203(a), 13–7–202 and 34.1–4–405.

No similar provision is found within the UVGA, and it would violate basic rules of statutory construction as well as the mandates of Wyo. Stat. Ann. § 3–6–119 for us to herein judicially enact such a provision.[4]

[¶ 33] Therefore, we hold that the district court erred as a matter of law when it utilized Wyo. Stat. Ann. § 3–1–202 to void the warranty deed granted from Andrews to Ethel Sheets and Blanche Wood. However, in so holding we do not in any sense imply that Andrews was competent to execute a warranty deed on November 25, 1998. Rather, our holding herein simply requires that, should the guardian and/or co-conservators seek to set aside the warranty deed granted

to the appellants on the grounds of the incompetency of Andrews, they must do so in an evidentiary hearing consistent with this court's precedent on the issue.

[¶ 34] Furthermore, the district court, though finding that the 1989 proceeding was a general adjudication, then decided that Wyo. Stat. Ann. § 3–6–110(b) of the UVGA authorizes and requires the co-conservators in this manner "to manage not only the assets of the ward derived from the Veterans' Administration, but any other property of the ward that may have been derived from other sources and said co-conservators have managed the ward's assets other than those derived from the Veterans' Administration pursuant to this statute and have reported lawfully and properly to this Court." While we presume that the guardian and conservators at all times were acting with the approval of the court, in Andrews' best interests in this case, and genuinely believed that their appointment authorized them to control the whole of Andrews' estate and further recognize that Andrews generally acquiesced in this treatment of his property by the guardian and co-conservators, we cannot agree that the UVGA grants a guardian appointed pursuant to it such broad authority. While some of the language contained within Wyo. Stat. Ann. § 3–6–110(b) may appear to grant the UVGA appointed guardian the option of administering property of the ward derived from sources other than the VA, this is not how this subsection has generally been interpreted in light of § 3–6–102(a)(iii) which defines "estate" and "income" as: "The terms 'estate' and 'income' shall include only moneys received by the guardian from the bureau and all earnings, interest and profits derived therefrom."

[¶ 35] We find the following reasoning of the California court in *Estate of Vaell,* 158 Cal.App.2d 204, 322 P.2d 579 (1958) referencing the annotation persuasive:

> As stated in the annotation on the Uniform Veterans' Guardianship Act found in 173 A.L.R., 1061, at page 1080: "While the

---

4. Various subsections within the UVGA reference and require application of the general laws of the state in governing the guardian/ward relationship. By this holding, we do not imply that in all

cases these general laws may not be used to supplement the UVGA in some manner so long as such supplementation is not inconsistent with the scope and purpose of the UVGA.

sections of the uniform act concerning the disposition of the 'income' and the 'estate' of the ward seem broad enough to include all income or estate, these provisions must be limited by the definitions of terms contained in section 1 of the original and revised acts. This view is strengthened by the facts that the original act requires an accounting only for moneys received from the Veterans' Bureau, that the revised act requires an accounting of moneys thus received and 'earnings, interest or profits derived therefrom and all property acquired therewith,' and that the revised act also provides that where a guardian is accountable for property derived from other sources, the general laws of the state shall govern the accounting, and he shall not be limited to the compensation provided by the uniform act with respect to the management of such other property, although he may combine his accountings for both types of property in a single account or report." At pages 1077–1078: "The effect of the appointment of a guardian under the uniform act is very limited as compared with the effect of an appointment under the general laws.... Accordingly, the appointment of a guardian under the uniform act has been held not to affect the legal capacity of the ward with respect to various matters other than the administration of property received from the United States under veterans' legislation." (Citations.) And on page 1079: *"Although it has been held that the uniform act is broad enough to authorize a decree giving a guardian control of all the ward's property, the better view is that the act deals only with property derived from the Veterans' Administration and the income of property acquired in whole or in part therewith"* citing *Mitchell v. Mitchell*, 201 Ga. 621, 40 S.E.2d 738; *Morse v. Caldwell*, 55 Ga.App. 804, 191 S.E. 479; *Rentz v. King*, 66 Ga.App. 292, 17 S.E.2d 896; *In re Parks*, 210 La. 63, 26 So.2d 289, 173 A.L.R. 1056, *Borough of East Paterson v. Karkus*, 136 N.J.Eq. 286, 41 A.2d 332; *In re Farina*, 253 App.Div. [A.D.] 510, 2 N.Y.S.2d 987, reversed on another ground

*In re Hewson [Farina]*, 279 N.Y. 780, 18 N.E.2d 865.

As was said in *Morse v. Caldwell, supra*, 191 S.E. at page 484: "What definition of 'incompetent' is applied by the Veterans' Administration, in determining whether or not the condition of a hospital patient requires that a guardian be appointed to receive and disburse for him such benefits as he may be entitled to is not shown by the record. But, upon the issuance of the certificate by the Director or his authorized representative 'setting forth the fact that such person has been rated incompetent,' etc., the court of ordinary may, upon a petition filed, appoint a guardian to handle the benefits due such person by the federal government. Except as to the relationship thus created for the special purpose named, it does not follow that the ward is not sui juris, and, with respect to his other property and purposes, entitled to assert for himself his full legal rights in and out of court."

322 P.2d at 583–84 (emphasis added).

[¶ 36] The *Vaell* court ultimately concluded that because a guardianship under the UVGA was never intended as a substitute for the issuance of general letters of guardianship under the state's probate code, the lower court's order purporting to give the guardian care of the ward's "property and estate" was overly broad necessitating reversal. *Id.* at 584.

[¶ 37] Upon examination of this issue, we find that the original purpose of the UVGA as enacted was to allow the Veterans' Administration a simplified procedure to ensure that recipients of federal funds were competent and capable of managing those funds. Wyo. Stat. Ann. § 3–6–107 carries out this purpose by providing that the VA's rating of incompetency is to be "prima facie evidence of the necessity for such appointment." Currently, however, the VA need not seek appointment of a guardian for one of its beneficiaries through state court pursuant to the UVGA but may appoint such a fiduciary through its own administrative procedures.[5]

5. *See* 38 C.F.R. 3.353; 38 C.F.R. 3.850; 38 C.F.R. 3.855; 38 C.F.R. Part 13–Veterans Bene-

fits Administration, Fiduciary Activities– 13.55;13.56;13.57; 13.58; 13.59. In fact, 38

Nevertheless, in Wyoming if a guardian is appointed under the simplified procedures of the UVGA, it is undoubtedly a limited appointment. A proposed ward's incompetency *is* the issue to be decided through an adjudication of incompetency as a condition precedent before a general guardian or conservator may be appointed.

### *CONCLUSION*

[¶ 38] We hold that the guardian and co-conservators of Andrews' estate were appointed under the provision the UVGA. Consequently, that appointment was limited in scope and effect and the district court's order voiding appellants' warranty deed granted by Andrews was erroneous. On remand, should appellees seek to invalidate appellants' warranty deed, they must make an evidentiary showing that Andrews was incompetent at the time he executed the deed. In addition, though we hold that under the 1989 appointment Andrews' guardian and co-conservator do not have authority to manage Andrews' whole estate, rather only those portions authorized under Wyo. Stat. Ann. §§ 3–6–101 through 3–6–119, because of the current alleged incapacity of Andrews, in his best interests, we will allow the district court, in its discretion to stay the effect of this holding to allow the appellees adequate time to seek a general guardianship/conservatorship in strict compliance with the procedures set forth in Wyo. Stat. Ann. §§ 3–1–101 through 3–3–1106 should they so choose.

[¶ 39] Reversed and remanded.

HILL, J., filed a dissenting opinion.

HILL, Justice, dissenting.

[¶ 40] I do not agree with the legal authority and reasoning as applied by the majority to the facts of this case and, therefore, I respectfully dissent.

[¶ 41] The majority's reliance on *Matter of Estate of Roosa*, 753 P.2d 1028 (Wyo.1988), exceeds the limited bounds of that case, which I would restrict solely to the issue of testamentary capacity. That issue remains to be determined by the district court in this case, and I trust it will be decided in accordance with governing law, including the guidance available in *Roosa*.

[¶ 42] At a minimum, I would shift the burden of proof from requiring Andrews and the guardian to show incompetence at the time the deed in controversy was signed, to requiring the Appellants to demonstrate Andrews' competence. *See Home Town Finance Corporation v. Frank*, 13 Utah 2d 26, 368 P.2d 72, 76 (1962); 77 Am.Jur.2d *Veterans and Veterans' Laws* § 50 (1997). Anything less renders meaningless the purpose of the statutes which afford special protection to incompetent veterans.

[¶ 43] Because I do see those statutes as providing significant protections to veterans, especially in circumstances such as those present in this case, I would also favor the additional step of fully affirming the district court for the reason that the Appellants clearly had actual notice of Andrews' incompetence and were not bona fide purchasers. *See Grose v. Sauvageau*, 942 P.2d 398, 402

C.F.R. 13.55 (1975 & Supp.2001) explicitly provides:

(a) *Authority*. The Veterans Services Officer is authorized to select and appoint (or in the case of a court-appointed fiduciary, to recommend for appointment) the person or legal entity best suited to receive Department of Veterans Affairs benefits in a fiduciary capacity for a beneficiary who is mentally ill (incompetent) or under legal disability by reason of minority or court action, and beneficiary's dependents.

(b) *Payees*. Authorized payees include:

(1) The beneficiary (§ 13.56(c));

(2) The beneficiary under supervision (supervised direct payment) (§ 13.56(a) and (b));

(3) The wife or husband of an incompetent veteran (§ 13.57);

(4) The legal custodian of a beneficiary's Department of Veterans Affairs benefits (§ 13.58);

(5) A court-appointed fiduciary to a beneficiary (§ 13.59);

(6) The chief officer of the institution in which the veteran is receiving care and treatment (§ 13.61);

(7) The bonded officer of an Indian reservation (§ 13.62);

(8) A custodian-in-fact of the beneficiary (§ 13.63);

(9) Dependents of the veteran by an apportioned award (§ 13.70).

(c) *Certification*. The Veterans Services Officer's certification is authority to make payments to the designated payee.

(Wyo.1997). Appellants did not act in good faith vis-à-vis this transaction, did not pay valuable consideration to Andrews or his guardian, had actual notice of Andrews' infirmities and the role of the guardian in his business and financial affairs, and would not be prejudiced by cancellation or reformation of the disputed deed (except they would have nothing, which is what they paid). How Andrews chooses to structure his last will and testament would then be decided, but his estate (including his home) would be available to provide care for Andrews during the remainder of his life.

[¶ 44] Although the case is not directly in point with respect to the wording of the governing statutes, I find enough similarity in the case of *Rymer v. Smith,* 38 Tenn.App. 414, 274 S.W.2d 643, 646–48 (1954), to accord it the status of persuasive precedent for the propositions set out above. In *Rymer,* the court held that establishment of a UVGA guardianship, in the manner provided for in the statute, was constructive notice to all, and financial transactions with a protected veteran were void. In this case, we need not sweep quite so broadly because the facts establish that the Appellants had actual notice of Andrews' incompetence. I also conclude that Wyo. Stat. Ann. §§ 3–6–110(b)[1] and 3–6–113[2] (LexisNexis 2001) (emphasis added) contemplate a more robust role for a

1. **§ 3–6–110. Annual accounting; copy of accounts and pleadings to be filed with bureau; notice of hearing; administration of property from other sources.**

(a) Every guardian, who has received or shall receive on account of his ward, any moneys from the veterans' administration, its predecessors or successor, shall file with the court annually, on the anniversary date of the appointment, in addition to such other accounts as may be required by the court, a full, true, and accurate account under oath, of all moneys so received by him, of all disbursements thereof, and showing the balance thereof in his hands at the date of such account and how invested. A certified copy of each of such accounts filed with the court shall be sent by the guardian to the office of the veterans' administration having jurisdiction over the area in which such court is located. A duplicate signed copy or certified copy of any petition, motion, or other pleading which is filed in the guardianship proceedings, or in any proceeding for the purpose of removing the disability of minority or of mental incompetency, shall be furnished by the person filing the same, to the office of the veterans' administration concerned. The court shall fix a time and place for the hearing on such account, petition, or other pleading, not less than fifteen (15) days nor more than thirty (30) days from the date of filing same, and notice thereof shall be given by the court to the aforesaid veterans' administration office not less than fifteen (15) days prior to the date fixed for the hearing. Notice of such hearing shall in like manner be given to the guardian.

(b) **Any guardian appointed under this act [§§ 3–6–101 through 3–6–119] shall be accountable for property derived from sources other than the veterans' administration and shall be accountable as is or may be required under the applicable law of this state pertaining to the property of minors or persons of unsound mind who are not beneficiaries of the veterans' administration; provided, however, that he may at his option administer the same as provided in this act and include an accounting for such assets**

**and income in the same account required with respect to assets derived from the veterans' administration, and if so included, the procedure with respect thereto shall be that hereinabove prescribed.**

2. **§ 3–6–113. Investment of surplus money; notice to bureau.**

(a) **It shall be the duty of such guardians to invest and keep invested their ward's surplus money,** but only in the securities or other property, and in the manner hereinafter indicated, and in which securities or other property the guardian has no interest. The investments, except those provided in paragraphs (i) and (ii) of this subsection hereof, shall be made only upon the prior approval of the court, after notice to the veterans' administration as provided in W.S. 3–6–110, as amended:

(i) Direct obligations of this state and of the United States government, and obligations, the interest and principal of which are both unconditionally guaranteed by the United States government;

(ii) The bonds of this state or of any other state, or any county, school districts, city, or town in the United States with a population as shown by next preceding federal census of not less than one thousand (1,000) inhabitants; and where the laws do not permit such counties, cities, school districts, or towns to become indebted in excess of six percent (6%) of the assessed valuation of property for taxation therein, and where the total indebtedness of such county, school districts, city, or municipality, does not exceed six percent (6%) of the assessed valuation of property for taxation at the time of such investment: provided always, there has been no default for more than thirty (30) days during the preceding ten (10) years upon any bonds of the issuing state, county, city or town;

(iii) In the legally issued notes of the owner of the fee simple title to improved, unencumbered real property located in this state secured by first mortgage or deed of trust thereon: pro-

veteran's guardian appointed under the UVGA than that espoused by the majority, at least under such circumstances as those evident in this case. I disagree with the majority's determination that these Appellants may use alleged due process violations in the establishment of the UVGA guardianship as a sword to defeat the protections provided by the UVGA. Andrews and his guardian, on the other hand, should be able to use those statutes as a shield against a deed prepared by Appellants, to their sole advantage, and contrary to Andrews' interests. For these reasons, I would affirm the order of the district court.

vided, that the total debt secured by such encumbrances shall not exceed sixty percent (60%) of the actual cash value of such real property at the time of such investment unless such loan be insured and while held by the guardian remain insured, by the federal housing administrator in accordance with the National Housing Act [12 U.S.C. § 1701 *et seq.*];

(iv) In the entire fee simple title to real estate or lease of real estate in this state and the purchase of all necessary equipment, but only as a home for the ward, or as a home for his dependent family, or to rehabilitate the ward, or to protect his interests. Such purchase or lease of real estate or other investment provided in

this paragraph shall not be made except upon the entry of an order of the court after hearing upon verified petition. Notice of such hearing shall be given the veterans' administration as provided in W.S. 3–6–110, as amended. Title shall be taken in the ward's name. This paragraph shall not be construed to limit the right of the guardian, on behalf of his ward, to bid and to become the purchaser of real estate at a sale thereof pursuant to decree of foreclosure of a lien held by or for the ward, or at a tax or a trustee's sale, to protect the ward's right in the property so foreclosed or sold, or at a sale under partition decree, if necessary to protect the ward's interest in such property.